

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-28-2006

# Shelton v. Carroll

Precedential or Non-Precedential: Precedential

Docket No. 04-9004

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Shelton v. Carroll" (2006). *2006 Decisions.* Paper 383.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/383

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 04-9004

\_\_\_\_\_

STEVEN SHELTON,

Appellant,

v.

THOMAS CARROLL,* Warden,
Delaware Correctional Center.

*(Amended - See Clerk's Order of 11/23/04)

\_\_\_\_\_

On Appeal From the United States District Court
For the District of Delaware
(D.C. Civ. No. 00-cv-00078)
District Judge: Honorable Sue L. Robinson

\_\_\_\_\_

Argued July 27, 2006

Before: RENDELL, AMBRO, and FUENTES, Circuit Judges.

(Opinion filed: September 28, 2006)

Thomas A. Pedersen
727-B North Market Street
Wilmington, DE 19801

Michael W. Modica (Argued)
P.O. Box 437, Suite 300
715 King Street
Wilmington, DE 19899

ATTORNEYS FOR APPELLANT

Thomas E. Brown (Argued)
Deputy Attorney General
Delaware Department of Justice
820 North French Street
Wilmington, DE 19801

ATTORNEY FOR APPELLEE

_____

OPINION OF THE COURT
_____

FUENTES, <u>Circuit Judge</u>.

        In 1993, Steven Shelton was convicted by a Delaware
jury of first-degree murder and sentenced to death.  After
exhausting his state court remedies, Shelton filed a 28 U.S.C. §
2254 petition for a writ of <u>habeas</u> <u>corpus</u> in federal court.  The
United States District Court for the District of Delaware denied
relief, and Shelton now appeals.  Shelton argues first that trial
counsel was ineffective in investigating and presenting
mitigating evidence at the penalty phase of his trial.  Second,
Shelton asserts that his right to a fair sentencing hearing was
violated by the trial court's limitation on the scope of his
allocution.  For the reasons that follow, we agree with the
District Court's ruling that Shelton's counsel was not ineffective
in his investigation and presentation of mitigating evidence and
that Shelton's right to a fair hearing was not violated by the trial
judge's limitation of Shelton's statement (called allocution) to
the sentencing jury.

## I.       FACTUAL AND PROCEDURAL BACKGROUND[1]

---

        [1] The factual and procedural background of this case is
well-documented in the prior opinions of the District Court and
the Delaware state courts.  <u>See</u> <u>Outten v. State</u>, 650 A.2d 1291

## A.    The Murder

On January 11, 1992, appellant Steven Shelton ("Shelton"), his brother Nelson Shelton, his cousin Jack Outten, and Nelson Shelton's girlfriend, Christine Gibbons, spent the afternoon drinking approximately one and one-half cases of beer at Gibbons' home in Newark, Delaware. At some point, the group discussed going to a bar where Gibbons would pose as a prostitute in order to lure men outside of the bar where Outten and the Sheltons could rob them. After stopping at several establishments in the area, the group eventually convened at a bar in New Castle known as "Fat Boys" or "Green Door." There, Gibbons met and talked with a stranger, Wilson Mannon, who bought her drinks. After last call, Mannon left with Gibbons, Outten, and the Sheltons in Nelson Shelton's car. The next day, January 12, 1992, police discovered Mannon's body on a deserted street in East Wilmington. Mannon's skull was completely shattered, his pockets were turned inside out, and his empty wallet was lying on the ground nearby. See Shelton IV, 2004 U.S. Dist. LEXIS 5538, at *5-8.

## B.    The Trial

On January 21, 1992, Outten and the two Shelton brothers were indicted for first-degree murder, first-degree felony murder, first-degree conspiracy, first-degree robbery, and possession of a deadly weapon during the commission of a felony. The three men were tried together by a jury in the Superior Court of Delaware over a period of one month.

Gibbons served as the prosecution's principal witness at

---

(Del. 1994) (denying direct appeal) (Shelton I); State v. Outten, No. CR. A. IN 92-01, 1997 WL 855718 (Del. Super. Ct. Dec. 22, 1997) (denying motion for post-conviction relief) (Shelton II); Shelton v. State, 744 A.2d 465 (Del. 2000) (affirming denial of post-conviction relief) (Shelton III); Shelton v. Snyder, Civ. No. 00-78-SLR, 2004 U.S. Dist. LEXIS 5538 (D. Del. Mar. 31, 2004) (denying 28 U.S.C. § 2254 petition) (Shelton IV).

trial.[2]  She ultimately testified that all three men beat Mannon and that Shelton kicked and punched Mannon in the face. According to Gibbons, Nelson Shelton hit Mannon with a hammer on the back of the head, causing Mannon to fall to the ground.  Outten then struck Mannon in the face and head approximately ten times with a large object Gibbons described as a "sink."[3]  Shelton II, 1997 WL 855718, at *7.  The medical examiner testified that Mannon died of wounds to the face and head and blows to the brain.  None of the defendants testified at trial.

On February 24, 1993, following two days of deliberations, the jury found the defendants guilty of all charges.

### C.    Penalty Phase[4]

The first discussions between the trial court and counsel concerning the penalty phase of the proceedings took place at a conference on February 24, 1993, during the jury's second day of deliberations.  Id. at *17.  Outten's counsel briefly mentioned his plans for the penalty hearing to the trial court.  Shelton's counsel indicated that while he had begun interviewing witnesses, he was anticipating a potential dilemma about what he could present at the hearing.  Nelson Shelton's counsel stated that he had twelve witnesses, but that his client might not want

---

[2] Gibbons initially provided inconsistent statements to investigators and at trial exculpating certain of the defendants. She later recanted and testified that all three defendants had in fact participated in the murder.  A detailed account of Gibbons' conflicting statements is set forth in Shelton IV, 2004 U.S. Dist. LEXIS 5538, at *7-14.

[3] The object was in fact the top of a discarded washing machine.

[4] Because Shelton's arguments in this appeal relate to the penalty phase of his trial, we provide a detailed account of those proceedings and, where appropriate, quote extensively from the record.

to present any mitigating evidence.  Id.

Later that day, after the jury returned its guilty verdict, the trial court asked counsel, in the presence of the defendants, what each of their clients intended to present at the penalty hearing. Outten's counsel stated that they planned to present mitigating evidence at the hearing, but Shelton and his brother stated that they would not be presenting such evidence.  Shelton also stated that he wanted to proceed without counsel.  Id.

Shelton's counsel explained to the court:

Your honor, my client has advised me that he has maintained his innocence throughout this trial, and that if he was found guilty, he has no wish to bring any family members or anyone else in his behalf into this courtroom to plea for him.  He does not wish to plea for mercy.  He does not wish to plea for mercy in any way.  He does not wish to put in any mitigating circumstances whatsoever.  He's prepared to take whatever faces him.  He's instructed me that I am not to put on mitigating factors in his behalf, and he's just now told me that he does not wish me to represent him any further; that he's giving notice to the Court that he wishes to represent himself and that I am not to say much more than that for him at this point.

Id. at *47.

The trial court then asked Shelton's counsel what he had done in preparation for the penalty phase of the trial:

COUNSEL: Well, Your Honor, I've just spent the last three and a half hours with his family, his mother and his sister.  They were my original plan. They are two witnesses that I originally intended to call in his behalf.
THE COURT: What were they going to say?
COUNSEL: Your Honor, they were going to talk

5

about his life, what kind of kid he was, what kind of upbringing he's had, all the difficulties in his life, what kind of a family-

. . . .

SHELTON: It's none of your business what my family has to say in my behalf.

THE COURT: I have to make a record. Numerous court opinions have made that quite clear. What they would have gone into, [counselor].

COUNSEL: Your Honor, his childhood, his upbringing, his life, their relationship with him.

THE COURT: Based on your discussion with them, were there any other witnesses or areas that you might have wanted to explore such as schooling or things like that?

COUNSEL: Nothing like that, Your Honor, no. There would be a real strong possibility that if I had my way, if my client would have so allowed me, I would be calling also his nieces.

THE COURT: For what purpose?

COUNSEL: And perhaps his step-brother for the same reason, Your Honor, to show the family relationship and their love for him.

Id. at *48.

Next the trial court inquired about counsel's discussions with Shelton concerning counsel's preparation for the penalty phase of the proceedings:

THE COURT: How much of this have you discussed with [Mr. Shelton], particularly apparently because you were in your office a little while ago discussing these matters with–

COUNSEL: Your Honor, [Mr. Shelton] has from very early on told me his position in this regard, and I told him what my intentions were. He, in fact, instructed me not to talk to his mother and not to talk to his sister, and to absolutely–

THE COURT: When did he tell you that?

6

COUNSEL: Just in the past couple of days when I told him of the dilemma . . . Your Honor . . . [,] I told him that as an officer of the Court I felt that I had to at least prepare because Your Honor could very possibly rule against me and him on his position in this regard so that therefore I was honor-bound to this Court to prepare something. He advised me that it was his strongest wishes that I not do that and, if I may, for the record, Your Honor, [Mr. Shelton] has advised [sic] will not now allow his mother even to visit him in prison because he does not want to cause anyone more pain or hurt in his family. He wants to remove himself from those people. He does not wish to have them be put in here and be put through this. That's his sincere and honest wishes, Your Honor.

Id. at *48-49.

The court asked counsel for his views on Shelton's decision not to present mitigating evidence:

THE COURT: As his counsel, are you indicating that you disagree with his decision to not present mitigating evidence?
COUNSEL: Your Honor, because I could possibly save him from the death penalty, I do. However, Your Honor, I believe that his dignity as a human being comes first, and my duty to him as an attorney goes to that issue first, and I also believe, Your Honor, as my client has said to me in this case, "I have maintained my innocence throughout, but this case is so horrible there's nothing I can say that would make any difference to this jury" and as a strategic matter, he feels that the jury would hold him in a higher regard, in a higher respect, if he said nothing, and in that regard, Your Honor, I believe that its possible that the jury could say and feel that if we presented no mitigating circumstances, that they could feel by the man's

7

silence and acceptance of his position that that is a more honorable, better thing that he's doing than to parade witnesses in here in his behalf, and they could, in fact, find that that single silence overweighed the aggravating factors. So I think there's a distinct possibility, I have to say, Your Honor–morally I agree with my client that he's entitled to the human dignity to go to his death if need be without fighting it and without having to come into this courtroom. As he said, "I will not crawl, I will not be part of begging for mercy from anyone," and I believe that he is absolutely entitled to that dignity. That perhaps, Your Honor, may be his last opportunity.

Id. at *49.

The trial court then addressed Shelton directly:

THE COURT: . . . [Y]ou asked for some time to collect your thoughts and maybe talk to [trial counsel]. I don't know whether you spoke to [trial counsel]. Have you had enough time as of the moment to collect your thoughts about this?
SHELTON: Yes, I have, Your Honor.
THE COURT: Go [a]head.
SHELTON: In light of the decision of the jury, I wish to dismiss my lawyer. I wish to further represent myself in this penalty phase. I feel that [trial counsel] has made his application to me. I paid him. He made his application to me as far as representing me through this trial even though I felt that he was insufficient in representing me through the trial, that the Court has denied me my right, I feel, since I paid for him, my right or decision to dismiss him during the trial. During this penalty phase I wish to represent myself. In respect to the victim's family, I do not wish to have my family in here in front of the jurors. The Court has found me guilty or the jurors has [sic]

8

found me guilty of the evidence that the State has presented to them. I wish or I plead with the Court to use the evidence that the State has presented them with in the penalty hearing. I still retain my innocence in this matter, and what I'm doing is asking the Court to use the evidence which they convicted me on.

THE COURT: They do. That's almost automatic if you will.

SHELTON: Then what I'm asking the Court is not to allow me or my attorney which I am-I don't want him to do anyway, to flaunt my family in front of the jurors and in front of the victim's family. I accept the decision, and I am asking the Court that I don't wish to flaunt any–

THE COURT: How long have you been thinking about this [Mr. Shelton]?

SHELTON: Quite sometime.

THE COURT: Can you tell me or put some time frame on that? Are you talking about days, hours or what?

SHELTON: Months.

THE COURT: That if it got to this stage, you didn't want to have anything said at the penalty phase?

SHELTON: Yes, sir.

THE COURT: When did you and [trial counsel] ever first talk about that? Or when did you ever first tell him in relation to this trial that that was your wish?

SHELTON: Months ago.

THE COURT: He mentioned before we recessed the fact that these were your wishes from early on I think were his words. You expressed to him some months ago that you desired that if you were found guilty of first degree murder, you did not want any mitigating evidence presented to the jury at the penalty phase?

SHELTON: That is true.

THE COURT: Do you understand that you have

9

the right to call witnesses to come in here and testify in front of this jury about why a life sentence should be appropriate? That's mitigating evidence.

SHELTON: I understand that completely.

THE COURT: You're sure?

SHELTON: Yeah. Yes, I understand that completely, and I do not want it.

Id. at *49-50.

Counsel explained his own position on the matter:

Your Honor, as I have discussed, as we have discussed this and was first mentioned many, many months ago. It was my sincere hope that [Mr. Shelton] would not pursue this avenue and that he would allow me to speak in his behalf, and in fact, I urged him, if not for him, for the other two gentlemen or for anybody whoever may come down after him; that there may be something said against capital punishment and in behalf of a sentence of life rather than death. He has throughout our discussions maintained a very straightforward and competent attitude to me that it was a sincere, honest, firm desire that he did not wish to be part of any sort of a plea or a request for mercy; that it's not his way, it's not in him; that the jury has found him guilty and he's ready to take his medicine.

Id. at *50.

Concerned that Shelton had not fully considered the implications of his decision, the trial court instructed Shelton to spend additional time thinking about his request. Id. at *18. The following day, February 25, 1993, in accordance with state procedural rules, Shelton's counsel submitted to the court and the prosecution a letter setting forth forty-three potential

10

mitigating factors.[5]  Id.  The full text of the letter reads as follows:

> This letter is in response to the State's notice of the statutory aggravating circumstances upon which they will rely in the penalty phase of the hearing. Defendant, [Steven Shelton], will rely upon the following mitigating circumstances:
>
> 1.      That he was raised in a three bedroom house with 10 other half-brothers and sisters.
> 2.      That his family experienced extreme financial difficulties as a result of his father's inability to work.
> 3.      That [Mr. Shelton] was happy as a very young child until he began experiencing great difficulty in school.
> 4.      That he became truant from school very regularly at the ages of 10 to 13 years of age.
> 5.      That at the age of 13, he was incarcerated at the Ferris School for truancy.
> 6.      That at the age of 15, he was charged with the crime of rape and tried as an adult and was sentenced to a lengthy period of incarceration.
> 7.      That while incarcerated as an adult, he was convicted of a crime within the prison and received an additional sentence.
> 8.      That [Mr. Shelton] was released from prison in August of 1991, at the age of 26 years, having served half of his life in prison.

_____

[5] Under DEL. CODE ANN. tit. 11, § 4209(c), in cases in which the death penalty is a potential punishment, each side is required to give notice to the other of the aggravating or mitigating circumstances on which they intend to rely.  Shelton II, 1997 WL 855718, at *18.

11

9. That [Mr. Shelton] was raised in a home with a father who was severely crippled, having lost his legs in an industrial accident.

10. That [Mr. Shelton]'s father was an alcoholic, who was physically, verbally and emotionally abusive to the children.

11. That [Mr. Shelton]'s brothers and sisters were taken from the home and placed in foster care a number of times and his family had been regularly broken up for that reason.

12. That all of [Mr. Shelton]'s older brothers became involved in some sort of juvenile or adult criminal activity and all of them were incarcerated at either Ferris School or at an adult facility.

13. That [Mr. Shelton], at the age of 10 and 11, was forced to go out at night to find his father, who was drinking in local bars, and push him home in the wheelchair.

14. That [Mr. Shelton]'s father would regularly whip him with a belt or a paddle, leaving welts and temporary marks which embarrassed him at school.

15. That [Mr. Shelton], at a very early age, was required to wear glasses which embarrassed and humiliated him in school and caused him to be the brunt of children's jokes and often violent attacks.

16. That [Mr. Shelton] was raised in a racially mixed neighborhood where there was great racial tension.

17. That [Mr. Shelton], as a young child, was regularly beaten and stolen from by blacks in his neighborhood.

18. That [Mr. Shelton]'s family did not require him to attend church as a young child and in his teenage years those efforts were unsuccessful.

19. That [Mr. Shelton], at the age of 15, was

charged with rape and was tried as an adult and sentenced to 8 years incarceration.

20. That despite the trauma and turmoil of his childhood and family life, he maintained a very close, warm relationship with both his mother and all of his brothers and sisters.

21. That [Mr. Shelton], since his last release from incarceration, has worked regularly for his sister and that he was a responsible and effective worker.

22. That [Mr. Shelton], during his spare time, remodeled a home for his sister so that she would have a place to live.

23. That during the period of time after his release from his last incarceration, [Mr. Shelton] worked full-time during the day with his sister and had a second job at night on a part-time basis.

24. That [Mr. Shelton] after his release from incarceration, was very mature and responsible regarding his work obligations.

25. That he seemed to demonstrate a need to relive his teenage years which he had spent in prison and thus would drink heavily at times and insisted on living life to its fullest.

26. That [Mr. Shelton] enjoys a very close, warm relationship with his sister Louise and her children.

27. That he is particularly close to his three nieces with whom he had demonstrated a great deal of affection and who are very close to him and would testify on his behalf.

28. That [Mr. Shelton] has demonstrated an inordinate concern for the well-being of his sisters and had regularly made extensive efforts to care for them and to protect them.

29. That [Mr. Shelton] has recently refused to allow his mother to visit him in prison because of the anxiety and concern which it

13

causes her.

30. That [Mr. Shelton] has always been a respectful and caring son to his mother.

31. That [Mr. Shelton] regularly cared for his mother, who as [sic] been very ill after a kidney transplant, and that he cared for her and provided her food and household services.

32. That [Mr. Shelton]'s father died on February 12, 1990, while he was incarcerated.

33. That defendant, [Mr. Shelton], was permitted to attend his father's funeral but only under guard and was not allowed to spend any time with him [sic] family to mourn his father's death. Additionally, his brother [Nelson Shelton], who was also incarcerated, was not allowed to be present with him and they were not permitted to comfort each other with the family at his father's funeral.

34. That [Mr. Shelton] took the death of his father very hard and was very depressed and emotionally disturbed by his death.

35. That [Mr. Shelton], like his father, was a very strong-willed individual.

36. That when [Mr. Shelton] was a young boy, he experienced the rape of his sister in his neighborhood and that had a very traumatic effect upon his life.

37. That [Mr. Shelton's] father was both physically abusive and cruel to him and was particularly cruel to him verbally and emotionally.

38. That [Mr. Shelton] grew up in a situation where nothing he could do was appropriate and right in his father's eyes and that he was subjected to constant emotional abuse because of that.

39. That [Mr. Shelton], as a young child on at

14

least two occasions, was assaulted and robbed while he was trick or treating.

40. That [Mr. Shelton]'s family would testify that his father never told [Mr. Shelton] that he loved him and that such words were never used in his presence.

41. That [Mr. Shelton]'s father was an alcoholic and from his earliest years, [Mr. Shelton] was subjected to this behavior. There is some evidence from the family that [Mr. Shelton] himself may suffer from an alcohol problem although he has never been so diagnosed.

42. That [Mr. Shelton] would regularly intercede between his brother [Nelson Shelton] and [Christine Gibbons] to prevent violence and that he worked with both of them extensively trying to make them resolve their conflicts without violence.

43. That [Mr. Shelton]'s mother was also an alcoholic, who regularly physically abused her children and that [Mr. Shelton] was both a victim of and witness to this abuse.

Id. at *18, n.16.

On February 26, 1993, Shelton was again called before the trial court. For the second time, Shelton stated that he wanted to proceed without counsel. Id. at *18. Counsel offered the following explanation of Shelton's decision:

COUNSEL: Now, Your Honor, one other point. You have asked [Mr. Shelton] about what I explained yesterday, and I'm not sure if I am expressing his words. I would say that we initially talked about–and maybe it answers Your Honor's question, [Mr. Shelton] said to me at one point, my feeling is that this was such a grievous, horrible murder, that there is nothing I could put in front of the jury that would make them have enough mercy

15

on me to give me life rather than death, and in fact, begging for mercy in front of this jury may have an adverse effect. They may feel that because, after being found guilty of this crime, if I come in here and plead for mercy, that may turn them off, and make them want to give me death. They may think less of me as a man if I plead for mercy. So as a strategic matter, there is the potential that he would be better off in getting a life sentence by saying to the jury, I have nothing to say. I will not ask–I will not put on mitigating circumstances and I will allow you to make your decision on the evidence the State has put forward, and that because–that a jury may very well look at that and say, here is a man who has been found guilty and is not going to plead for mercy, and we respect him for that . . . . That was the discussion that Steve and I have had. I hope I'm not saying something he doesn't want me to say because when you asked him that question, he didn't respond that way.
SHELTON: That's pretty close.

Id. at *51-52.

The trial court then engaged Shelton in a lengthy discussion. The court reviewed with Shelton several of the mitigating factors set forth in counsel's February 25 letter, which Shelton said he had already reviewed with counsel. Id. at *52. The trial court explained to Shelton that if he did not present any evidence to the jury at the penalty hearing, the jury would not hear about any of these potentially mitigating circumstances. Shelton repeated that he understood the consequences of his decision. Id. The trial court thereafter ruled that Shelton could proceed pro se and his attorney was appointed as standby counsel. Id. at *18.

On the day of the penalty hearing, March 1, 1993, counsel informed the trial court that Shelton had changed his mind and now wanted counsel to represent him at the hearing provided certain conditions were met. Shelton had to be able to approve

16

all of his counsel's questions to witnesses, have veto power over which witnesses would be called, and have the right to speak in allocution. In addition, his counsel would be permitted to make a closing argument to the jury. Id. at *18-19.

With respect to the scope of the mitigating evidence that would be presented, counsel explained:

> COUNSEL: I submitted a list to Your Honor of mitigating circumstances. I intended to call several witnesses to produce that. Already in our discussions, [Mr. Shelton] has advised me that I will not be able to call those witnesses. There's possibly one witness who will be called for three or four very brief questions. And in fact, my list of questions that I prepared for that witness, I have this morning reviewed with [Mr. Shelton], and he's advised me that he will not allow me to even ask some of those questions. And he tells me that sometime later today, we will meet and will hone down those questions to the one witness to his liking. And I would be permitted to ask only those questions, and then give my closing arguments. There may be more than one witness.
> THE COURT: You just want to keep your options open?
> COUNSEL: Yes, Your Honor.
> THE COURT: Is that correct, [Mr. Shelton]?
> SHELTON: That is correct.

Id. at *53.

The Court again questioned Shelton directly about his decision:

> THE COURT: [Trial counsel] has indicated there are some matters of the forty-three he listed in his letter of potential mitigating circumstances here, mitigating factors, that you do not want some of them presented to the jury. Is that correct?

17

SHELTON: That's correct.

THE COURT: And you would like him to stay in this case as [y]our attorney, and have him represent you, but on the condition that you be able to decide to present certain of those matters but to not present other matters. Is that correct?

SHELTON: That is correct. Only what I instruct him to bring up is basically all that I would want him to bring out. I understand [trial counsel]'s position against the death penalty, and I respect that decision, as he respects my decision, and I feel that I'm not doing nothing unethical in his belief as far as his representation of me.

THE COURT: How, if you retain the right to not present some or any, shall we say, of the forty-three items he's listed in the letter, okay, do you understand that you may or you are–may be or you are keeping from the jury and from me certain mitigating factors?

SHELTON: I understand that completely.

Id.

The joint penalty hearing for Outten and the Shelton brothers commenced with opening statements by the prosecution and the defense. Shelton's counsel stated to the jury: "My client has instructed me to advise you that he will not be begging for his life in this case." Id. at *19.

The prosecution then presented evidence relating to Shelton's prior criminal history, including testimony about Shelton's 1982 conviction for rape, his 1985 conviction for assault, his assault of a fellow inmate while incarcerated for the rape, and his arrests in 1991 and 1992 for first-degree robbery and driving under the influence. Id. at *19-20.

The defense then presented its mitigation case to the jury. Shelton's older half-brother, Edward, and two older half-sisters, Dorothy and Louise, were the only witnesses to testify on his behalf. Edward explained that there were eleven children in the

18

Shelton household. Five children were from their father's previous marriage and four were from Shelton's mother's previous marriage. Shelton and his brother Nelson were the only two biological children of both parents. Id. at *23. Edward stated that their father had lost both of his legs in a work accident, drank a lot, beat his children regularly while rarely, if ever, expressing affection. Edward said that Shelton was very upset when their father died in 1990. Id. With respect to his own life, Edward testified that when he was twelve years old, he contacted a social worker to help him get out of the house. He described his own problems with violence and substance abuse, explaining that he had only recently managed to straighten himself out. Id.

Shelton's thirty-nine year-old half-sister, Dorothy, testified that she had moved out of the house when she was a teenager because of the anger and violence there. Dorothy explained that her parents

> were incapable of handling the task they took on.
> And the task was a blended family, which
> developed into nine children, which developed into
> eleven. There was a lot of pressure in raising that
> number of children in such a small environment.
> My father had suffered many hardships. And I
> think through those hardships, he resorted to
> alcohol. He lost his legs. He was in a coma for
> encephalitis, and they thought he would never
> come out of it, but he did. He developed cancer.
> He developed diabetes. He eventually lost his
> voice.

Id. at *23-24. Dorothy went on to describe the abuse:

> There were times when they would come home at
> night after being out drinking, and we would be
> called downstairs. Sometimes we were beaten
> with a leather strap, which left welts on our legs,
> blood welts. And when I was a child, we were not
> allowed to wear pants to school, and we didn't go

19

to school because of the marks.  They were embarrassing.

Id. at *24.  Dorothy stated that after she moved out of the house, she was not surprised to learn that Shelton, who was seven or eight years-old at the time, was having trouble in school and getting into a lot of fights.  Id.

Louise, seven years older than Shelton, testified that she saw Shelton change from a happy child to an upset one around the third or fourth grade.  According to Louise, their father would call the children belittling names and curse them.  Louise stated that when Shelton was ten or eleven years-old, he was forced, even on school nights, to go to bars and bring his drunk father home in his wheelchair.  Louise testified that, around this time, Shelton started becoming truant in school, eventually resulting in his incarceration at the Ferris School.  Louise also said that because their father was often drunk, he did not notice that Shelton had begun drinking at an early age.  Id. at *24-25.

According to Louise, because they were one of the few white families in a  predominantly African-American community, Shelton got into a lot of fights with other kids in the neighborhood, which added to his difficulties in school.  Id. at *54.  Louise stated that she too missed a lot of school and spent at least one year during high school in a juvenile home.  Id. at *25.

Louise testified that despite his many problems, Shelton was a loving and caring brother.  She explained that after Shelton was released from prison after his rape conviction, he visited her and her family quite frequently.  She also noted that, around this time, Shelton worked for her and her family during the day, and held a part-time job at night.  Finally, Louise testified that Shelton helped another one of their sisters repair her home and that, when Shelton earned money he helped his mother pay her bills.  Id.  No other mitigating evidence was presented to the jury.

After the jury was excused, the trial court again

questioned Shelton directly about his mitigation case. Shelton stated that he and counsel had consulted and agreed not to present additional witnesses, and that he was satisfied with the questions already asked of the witnesses. When the jury returned, Shelton made the following brief statement to the jury:

> Ladies and gentlemen of the jury, I stand before you not to plead for my life. I feel that's wrong and improper and basically disrespectful to the victim's family and to mine. The State has painted a picture, and that picture is not very pretty, pertaining to me and my co-defendants. And I would just like to present to the jury a different side or a different meaning to Steven Shelton. The State has pictured me as being a monster, as being a rapist, as being a violent individual, that's not so. The State only presents one side of the picture. There's two sides to every story. And the State just presents a negative side. The jury has found me guilty of these allegations, and now it's the jury's turn to render a verdict. And that verdict is either life or death. Again, I'm not here to plead for my life, but just ask the jury to be fair in their decisions. That's all I have to say.

Id. at *26.

Two days later, the jury unanimously decided that the evidence showed beyond a reasonable doubt the existence of three statutory aggravating circumstances: (1) the murder was committed during a robbery; (2) the murder was committed for pecuniary gain; and (3) the victim was more than sixty-two years old. Shelton IV, 2004 U.S. Dist. LEXIS 5538, at *19-20. By a vote of eight to four, the jury found by a preponderance of the evidence that the statutory and non-statutory aggravating circumstances[6] outweighed the mitigating circumstances

---

[6] The non-statutory aggravating circumstances included evidence of Shelton's prior criminal history, which was introduced by the State at the penalty hearing.

presented by the defense. Accordingly, the jury recommended that Shelton receive a death sentence. Id. The trial court agreed and, on April 30, 1993, Shelton was sentenced to death by lethal injection.[7] Id. at 20.

### D. Direct Appeal

Shelton raised six principal arguments on appeal to the Delaware Supreme Court: (1) the State negligently failed to secure and preserve certain key physical evidence introduced by the prosecution; (2) the trial court erred in finding Gibbons to be a competent witness; (3) the trial court improperly instructed the jury regarding the burden of proof for non-statutory aggravating circumstances; (4) the trial court improperly excluded certain defense witness testimony; (5) the trials should have been severed; and (6) the prosecution exercised at least one of its peremptory challenges in violation of Batson v. Kentucky, 476 U.S. 79 (1986). Finding that Shelton failed to show that the trial court committed any errors of law or abused its discretion, the Delaware Supreme Court affirmed his sentence. Shelton I, 650 A.2d at 1293.

### E. State Post-Conviction Relief Proceedings

After the denial of his direct appeal, Shelton filed a motion for post-conviction relief in the Delaware Superior Court. Shelton asserted a number of errors arising out of the penalty phase of the proceedings: (1) the trial court erred in conducting a joint penalty hearing; (2) trial counsel was

---

[7] The jury recommended the death penalty for Outten by a vote of seven to five and for Nelson Shelton by a vote of eight to four. Shelton IV, 2004 U.S. Dist. LEXIS 5538, at *19-20. The trial court sentenced both men to death. Outten filed a direct appeal of his sentence, which the Delaware Supreme Court denied. After applying, unsuccessfully, in state court for post-conviction relief, Outten filed a federal habeas corpus petition in the United States District Court for the District of Delaware. This too was denied. Nelson Shelton did not challenge his conviction or sentence. He was executed in 1995. Id. at *2.

ineffective for not requesting a separate hearing; (3) appellate counsel failed to raise the severance issue on direct appeal; (4) the trial court impermissibly restricted his right to allocution; (5) trial and appellate counsel were ineffective in not raising the allocution issue; (6) trial counsel was ineffective in his preparation and presentation of mitigating evidence; (7) the prosecutor made an improper statement concerning Shelton's allocution; and (8) trial and appellate counsel were ineffective for not raising the issue of prosecutorial misconduct. Shelton II, 1997 WL 855718, at *37.

The Delaware Superior Court rejected each of these arguments. Id. at *75. The decision was subsequently affirmed by the Delaware Supreme Court. Shelton III, 744 A.2d at 472.

### F.      Federal **Habeas** Petition

Having exhausted his state court remedies, Shelton filed a pro se petition for a writ of habeas corpus in the United States District Court for the District of Delaware on February 7, 2002. After the District Court appointed counsel, Shelton filed an amended petition, asserting six grounds for relief: (1) his right to a fair trial was violated by the trial court's admission of testimony about his prior criminal history; (2) the trial court improperly limited the scope of his allocution; (3) the prosecutor's closing remarks regarding Shelton's lack of remorse violated his Fifth Amendment right against self-incrimination; (4) he received ineffective assistance of trial counsel in violation of the Sixth and Fourteenth Amendments; (5) the Delaware Death Penalty Statute under which he was convicted and sentenced to death was unconstitutional; (6) the trial court failed to properly instruct the jury regarding the burden of proof for non-statutory aggravating circumstances. Shelton IV, 2004 U.S. Dist. LEXIS 5538, at *32-33.

The District Court rejected each of these arguments, but granted a certificate of appealability with respect to the two claims raised in this appeal.

## II.      JURISDICTION AND STANDARD OF REVIEW

23

The District Court had jurisdiction over Shelton's habeas petition under 28 U.S.C. § 2254. We have appellate jurisdiction under 28 U.S.C. §§ 1291 and 2253. Because the District Court did not hold an evidentiary hearing on these claims, our review of the District Court's legal conclusions is plenary. Jacobs v. Horn, 395 F.3d 92, 99 (3d Cir. 2005).

28 U.S.C. § 2254 provides that an application for a writ of habeas corpus cannot be granted on a claim that was adjudicated on the merits in the state court unless the adjudication: (1) resulted in a decision that was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is contrary to Supreme Court precedent under § 2254(d)(1), if the state court reached a "conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Jacobs, 395 F.3d at 100 (internal quotation marks omitted).

The state court's decision is an unreasonable application of clearly established law, under § 2254(d)(1) if the state court: (1) unreasonably applies the correct Supreme Court precedent to the facts of a case; or (2) unreasonably extends or refuses to extend that precedent to a new context where it should (or should not) apply. Id. "The unreasonable application test is an objective one–a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly." Id.

We have previously held that our analysis under § 2254 is a two step process. Matteo v. Superintendant, SCI Albion, 171 F.3d 877 (3d Cir. 1999) (en banc). First, we "identify the

24

applicable Supreme Court precedent and determine whether it resolves the petitioner's claim." Id. at 888. "If [we determine] that the state court decision was not 'contrary to' the applicable body of Supreme Court law–either because the state court decision complies with the Supreme Court rule governing the claim, or because no such rule has been established–then [we] should undertake the second step of analyzing whether the decision was based on an 'unreasonable application of' Supreme Court precedent." Id. at 889.

## III. DISCUSSION

Shelton argues on appeal that (1) his trial counsel provided ineffective assistance at the penalty phase, and (2) the trial court improperly limited his right of allocution. We address each argument in turn.

### A. Ineffective Assistance of Counsel

#### 1. Mitigation Evidence at the Penalty Hearing

On the day the jury returned its verdict, Shelton's counsel informed the trial court that he had interviewed Shelton's mother and sister for approximately three and one-half hours the previous day and intended to call both women as witnesses at the penalty hearing. Counsel also stated that he was considering calling other family members as witnesses to testify on Shelton's behalf, including Shelton's brother Edward and two of Shelton's nieces. Counsel explained that he planned to focus on "what kind of kid [Mr. Shelton] was, what kind of upbringing he's had, all the difficulties in his life," and to show "the family relationship and their love for him." Shelton II, 1997 WL 855718, at *48. The trial court asked counsel whether there were "any other areas that [he] might have wanted to explore such as schooling or things like that?" Counsel responded in the negative. Id. Counsel submitted a letter to the court the following day that identified forty-three mitigating factors which largely echoed the themes identified to the court the previous day. Id. at *18, n.16.

25

As noted, at the penalty hearing, three witnesses testified on Shelton's behalf– Shelton's half-sisters, Dorothy and Louise, and his half-brother, Edward. Shelton's siblings recounted their parents' abuse, difficulties that Shelton faced in school and in their neighborhood, and his otherwise dysfunctional upbringing. The siblings also described Shelton's close relationship with several members of his family. No other evidence–such as family court records, social service agency records, or expert reports or testimony–was presented to the jury.

> 2. Reports Prepared for Proceedings for Post-Conviction Relief

In his state court proceedings for post-conviction relief, Shelton submitted two lengthy reports prepared by Pamela Taylor, a licensed clinical social worker. Taylor's reports were the product of her detailed interviews with Shelton, Shelton's mother, several of Shelton's sisters, and a number of individuals who knew Shelton during his childhood and adolescence. Taylor also reviewed various other records, including records from the Family Court and Shelton's schools, as well as reports prepared by Dr. Jeffrey Janofsky, a psychiatrist who examined Shelton in late 1995, and by Dr. David Schretlen, a psychologist who evaluated Shelton around the same time. Id. at *57-59.

In her initial, ninety-eight page report, Taylor opined:

> Based upon my evaluation of [Mr. Shelton] and review of the Penalty Phase transcript of his trial, it is my opinion in relation to this trial that the Defense Council's [sic] investigation and ensuing presentation of available mitigating evidence in this case [were] seriously deficient. As a result, mitigating factors were not adequately supported, nor fairly represented for the Court's consideration.

Id. at *63. In this regard, Taylor listed fourteen factors that she identified as mitigating:

1. Mother's alcohol consumption during pregnancy with [Mr. Shelton].
2. Dysfunctional rearing by alcoholic parents.
3. Physical abuse during formative years.
4. Emotional abuse during formative years.
5. Stressful home environment during early development.
6. Additional childhood experiences of physical and emotional victimization by peer group, as minority member of a predominantly African-American neighborhood.
7. Prevailing negative family reputation and associated negative expectations, which preceded [Mr. Shelton] in the school and court systems.
8. Lack of appropriate role models and moral upbringing.
9. Lack of protective, supportive resources.
10. Lack of opportunity to benefit from recommended psychotherapeutic intervention.
11. Gaps in the existing community resources to identify and intercede in abusive domestic situations, and to insure early preventative mental health to its young victims.
12. Delayed identification by school system, of specialized learning needs.
13. Early on-set substance abuse problems.
14. Impaired personality organization, stemming from childhood experiences.

Id. at *63. In a 143-page supplemental report, Taylor further elaborated on these same findings. Id. at *64-74.

### 3. Analysis

Shelton argues that "[c]omparing defendant's background as revealed in Taylor's report, against the minimal

27

evidence presented at the penalty phase hearing, leads to the ineluctable conclusion that trial counsel was ineffective." Appellant's Br. at 27. We do not agree.

Shelton's claim of ineffective assistance of counsel is governed by the familiar two-prong test set forth in Strickland v. Washington, 466 U.S. 668 (1984). Wiggins v. Smith, 539 U.S. 510, 521 (2003). Under Strickland, a defendant must demonstrate that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's error, the result would have been different. Strickland, 466 U.S. at 687-88, 694. In this case, we find that neither requirement is satisfied.

Under Strickland, "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id. at 690. As the Court in Strickland explained:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 690-91.

Moreover, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by defendants own

28

statements or actions." Id. at 691.[8]

---

   [8] In Strickland, the Court stated that "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable, but they are only guides." Strickland, 466 U.S. at 688. In this case, the ABA guidelines concerning investigations in capital cases applicable in 1993 provide, in relevant part:

>   A.    Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously.
>
>   . . . .
>
>   C.    The investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered. This investigation should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.

American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1 (1989). The ABA guidelines were amended in 2003. The commentary to current Guideline 10.7 states:

>   This Guideline is based on portions of Guideline 11.4.1 of the original edition. Changes in this Guideline [not applicable to trial counsel's performance in this case] clarify that counsel should conduct thorough and independent investigations relating to both guilt and penalty issues regardless of overwhelming evidence of

In this case, it was Shelton, not his attorney, who decided to limit the scope of the investigation and the presentation of mitigating evidence to the jury. Counsel had submitted to the court a letter listing forty-three mitigating factors that could be presented on Shelton's behalf. Despite counsel's investigation and his recommendation that Shelton present this evidence, Shelton decided that the evidence should not be presented. Indeed, Shelton's initial request to proceed pro se at the penalty phase stemmed, at least in part, from his disagreement with counsel's insistence that Shelton present mitigating evidence. Shelton II, 1997 WL 855718, at *18. The extensive discussions Shelton and his counsel had with the trial court demonstrate that Shelton decided several months prior to the verdict that, if the jury were to find him guilty, he would not want to "plea for mercy" or "put in any mitigating circumstances whatsoever." Id. at *47. Shelton's decision was based in part on his desire to spare his family the trauma of testifying, and he also believed it might be an effective strategy. However unwise that decision may have turned out to be, it was ultimately Shelton's decision and not counsel's. Nonetheless, as will be discussed, evidence in mitigation was, in fact, presented and counsel's reliance on Shelton's deliberate and strategic determination that he ought not present mitigating evidence does not rise to the level of unreasonableness under Strickland.

Moreover, we believe that even if Shelton could show that counsel's performance was deficient, he is unable to satisfy the prejudice requirement of the Strickland test. In order to show prejudice, Shelton must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine

---

guilt, client statements concerning the facts of the alleged crime, or client statements that counsel should refrain from collecting or presenting evidence bearing upon guilt or penalty.

American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.7 (2003).

30

confidence in the outcome." Strickland, 466 U.S. at 694. In challenging a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695.

Here, almost all of Pamela Taylor's proposed mitigating factors were presented to the jury during the penalty phase through the testimony of Shelton's siblings. For example, Shelton's siblings described how he was physically and emotionally abused by their alcoholic parents. They spoke of their stressful home environment, including the crowded home and their father's disabilities. They discussed the racial tension in the neighborhood, Shelton's troubles at school, and the fact that his siblings were removed from the family home because of his parents' abuse. Taylor's report, as well as the reports of Dr. Janofsky and Dr. Schretlen, simply discuss these very issues in greater detail and, arguably, with greater credibility. But, they would not have altered, in the end, the total mix of information upon which the jury and the trial court based their decisions to impose the death penalty.

Moreover, any additional mitigating evidence or analysis presented by the expert reports must be considered in light of the aggravating circumstances presented by the State, including testimony concerning Shelton's prior rape and assault convictions, his arrests for robbery and assault and, perhaps most importantly, the victim's age and the brutal nature of his murder. In light of this aggravating evidence, the state court's determination that Shelton was not prejudiced by counsel's alleged deficiencies was a reasonable application of Strickland.

### B. Allocution

Prior to the penalty hearing, the trial court gave two instructions concerning Shelton's right to speak in allocution. The first instruction was given as part of the discussion of Shelton's request to proceed pro se:

COUNSEL: . . . [Mr. Shelton] reserves your

31

Honor, most particularly and first and most importantly his right to allocution. He has indicated to me that he is prepared to take the stand and make a statement to the jury, with or without having called witnesses, and that he understands that he has a right to allocution without cross examination.

THE COURT: Well, if he takes the stand, he's not speaking in allocution as such. That will be a separate matter during which he cannot talk about the events of January 11, 12 1992.

COUNSEL: Excuse me, you Honor.

THE COURT: He can't get into–if he's speaking in allocution, he cannot discuss the events of January 11 and 12, 1992.

. . . .

COUNSEL: Your Honor, he understands that. He can't talk about any factual evidence. What he would intend to address them on is his life or his feelings about this matter, and that he believes and understands that if he does that and does not talk about any factual circumstances, that he can do that without cross examination.

Shelton III, 744 A.2d at 489-490. The second instruction was given later that day, after the trial court granted Shelton's request to proceed pro se:

THE COURT: . . . it does not prevent you in any way from speaking to the jury in allocution and to me. Do you understand that?

SHELTON: Allocution, I don't–

THE COURT: Allocution is a very technical word, speaking to the jury on your own behalf. I apologize for using a word that [even] most lawyers don't know. Allocution is a very legalistic way for asking the sentencing authority, whether it's a judge or a jury, to give you mercy, spare your life in this case, and sentence you to life. That's what it really means, to explain your humanity, you

32

know.

SHELTON: I understand.

THE COURT: Whether you want to–you can't argue about the facts. You can talk about yourself, your background, your upbringing, your education, your folks at home, any alcohol abuse problems, things like that. You can talk about all those things as much as you want. You just can't talk about the facts surrounding the murder. Do you understand that?

SHELTON: Yes.

Id. at 490.

Shelton argues that the trial court improperly limited his right to allocution. In particular, he argues that the trial court's instructions "prevented him from fully expressing his feelings to the jury, including any statements regarding relevant matters such as the circumstances of the crime, his conduct and relative culpability, if any." Shelton III, 744 A.2d at 488. Shelton argues that his claim is not about whether a defendant has a federal constitutional right to allocution, but whether the broad mandate of Lockett v. Ohio, 438 U.S. 586 (1978), and Eddings v. Oklahoma, 455 U.S. 104 (1982), supporting the presentation of evidence pertaining to a defendant's conduct and the circumstances of his crime, applies when a capital defendant is presenting mitigating evidence in allocution. Shelton argues that the Supreme Court in Lockett ruled that the sentencer must be free to consider any evidence the capital defendant offers regarding his character, record, or the crime. Appellant's Br. at 12. He contends that allocution is just one way of presenting mitigating evidence. Thus, Shelton argues that the Delaware Supreme Court's decision was contrary to the U.S. Supreme Court's decision in Lockett.[9]

_____

[9] In affirming the Delaware Superior Court's denial of post-conviction relief, the Delaware Supreme Court provided a full explanation of its reasoning. First, the Court traced the common-law origins and evolution of the right to allocution. Shelton III, 744 A.2d at 491. Second, the Court noted the lack

33

We find that Shelton's argument does not provide a basis upon which this Court can grant relief. The Supreme Court has not held that criminal defendants have a constitutional right to allocution. Hill v. United States, 368 U.S. 424, 429 (1962) (leaving open the question of a defendant's constitutional right to allocution).

Some of our sister Courts of Appeals have held that criminal defendants do not have a constitutional right to allocution. See, e.g., United States v. Patterson, 128 F.3d 1259, 1260 (8th Cir. 1997) (holding that a capital defendant has no constitutional right to address a sentencing jury in allocution); United States v. Barnette, 211 F.3d 803, 820 (4th Cir. 2000) (same); United States v. Hall, 152 F.3d 381, 396 (5th Cir. 1998) (holding that capital defendant has no constitutional right to make an unsworn statement of remorse to the jury that is not subject to cross-examination), abrogated on other grounds by United States v. Martinez-Salazar, 528 U.S. 304, 310 (2000).

In Lockett, a plurality of the Justices held that "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect

---

of uniformity in the way that state and federal courts define the right to allocution in the modern criminal context. Id. at 492-93. Third, the Court noted that "the majority of federal courts and state jurisdictions hold that the United States Constitution does not protect the right to allocution." Id. at 493. Fourth, the Court observed that "the United States Supreme Court has not addressed squarely the issue of whether the United States Constitution protects the right of a capital defendant to make before the jury an unsworn statement that is not subject to cross-examination." Id. at 494. The Court then went on to find that a criminal defendant in a capital case does have a right to allocution based on the Delaware Death Penalty Statute and state decisional law. Id. at 494-95. Analyzing Shelton's claim under Delaware state law, the Court then concluded that although the trial court's instructions concerning the scope of Shelton's colloquy was "overbroad," it was harmless error in this case. Id. at 497.

of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604 (emphasis in the original).[10] The Court concluded that the challenged state statute was unconstitutional because it did not permit consideration of relevant factors such as the defendant's age, minor role in the offense, or lack of intent to cause death. Id. at 608.

The Supreme Court recently addressed the applicability of Lockett to the presentation of new evidence at the sentencing phase of a capital murder trial. In Oregon v. Guzek, 126 S. Ct. 1226 (2006), the defendant sought to present testimony by his mother at his re-sentencing hearing which would support his alibi. The Court rejected the argument that Lockett supported a right to present such evidence, and held that the state's limitation barring such evidence did not violate the Constitution. Id. at 1233. The Court explained that the evidence at issue in Lockett and other prior cases involved how, and not whether, the defendant committed the crime and was therefore not inconsistent with the jury's finding of guilt. Id. at 1231. The Court also noted that in Franklin v. Lynaugh, 487 U.S. 164 (1988), a plurality of the Justices clarified that previous decisions have not recognized an Eighth Amendment right to present evidence casting doubt on a capital defendant's guilt at the sentencing phase. Id. at 1231-32.[11]

As noted earlier, Shelton argued in his post-conviction proceedings that he wished to address in his allocution "the circumstances of the crime, his conduct and relative culpability, if any." Shelton III, 744 A.2d at 488 (quoting appellant's opening brief in support of his motion for post-conviction relief).

_____

[10] The plurality's holding in Lockett was later adopted by a majority of the Court in Eddings v. Oklahoma, 455 U.S. 104, 110 (1982).

[11] In Guzek, the Court determined that it did not need to reach this question because any such right would not extend to the situation in Guzek. Guzek, 126 S. Ct. at 1232.

However, because Shelton did not testify at trial, any factual statements about what happened on the night of the murder and his involvement in the crime would have been new evidence not already in the trial record.

We conclude that the Delaware Supreme Court's denial of Shelton's claim was not contrary to or an unreasonable application of Lockett or any other clearly established federal law as determined by the Supreme Court. Thus, Shelton is not entitled to relief on this claim under 28 U.S.C. § 2254.

## IV. CONCLUSION

The Delaware Supreme Court's decision that counsel was not ineffective in his investigation and presentation of mitigating evidence was a reasonable application of Strickland. The Court's determination that Shelton's right to a fair hearing was not violated by the trial court's limitation on the scope of his allocution was not contrary to clearly established federal law.

For these reasons, we will affirm the District Court's order denying Shelton's petition for a writ of habeas corpus.