Charles RAMOS, Petitioner,

v.

Raymond LAWLER, et al., Respondents.

No. 07–cv–1917.

United States District Court, M.D. Pennsylvania.

May 14, 2009.

Heidi R. Freese, Federal Public Defender, Harrisburg, PA, for Petitioner.

Edward M. Marsico, Jr., James P. Barker, District Attorney's Office, Harrisburg, PA, for Respondents.

### *MEMORANDUM*

JOHN E. JONES III, District Judge.

**THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:**

This matter is before the Court on the Report and Recommendation ("R & R") of Magistrate Judge J. Andrew Smyser (Rec. Doc.24), which recommends that Petitioner Charles Ramos' ("Petitioner" or "Ramos") petition for writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254, be granted in relation to his conviction for conspiracy to commit murder.[1]

Both Ramos and the Respondents filed timely objections to the R & R. Accordingly, the matter is ripe for disposition. For the reasons set forth below, the Court will overrule both the Petitioner's and Respondents' objections and adopt the Magistrate Judge's R & R in its entirety.

### I. *STANDARD OF REVIEW*

When objections are filed to the report of a magistrate judge, the district court makes a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objections are made. 28 U.S.C. § 636(b)(1); *United States v. Raddatz,* 447 U.S. 667, 674–75, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). The court may accept, reject, or modify, in whole or in part, the magistrate judge's findings or recommendations. *Id.* Although the standard of review is *de novo,* 28 U.S.C. § 636(b)(1) permits whatever reliance the district court, in the exercise of sound discretion, chooses to place on a magistrate judge's proposed findings and recommendations. *Raddatz,*

---

1. As we will recount below, Petitioner was also convicted of aggravated assault and conspiracy to commit aggravated assault in the Dauphin County Court of Common Pleas.

447 U.S. at 674–75, 100 S.Ct. 2406; *see also Mathews v. Weber*, 423 U.S. 261, 275, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976); *Goney v. Clark*, 749 F.2d 5, 7 (3d Cir.1984).

## II. STATEMENT OF FACTS [2]

On February 13, 2003, Ramos was convicted by a jury in the Dauphin County Court of Common Pleas of criminal conspiracy to commit murder, criminal conspiracy to commit aggravated assault, and aggravated assault. During that same proceeding, he was acquitted of one count of attempted homicide. Petitioner appealed, but his conviction was upheld by the Superior Court of Pennsylvania. Petitioner proceeded to file a Pennsylvania Post Conviction Relief Act ("PCRA") Petition, claiming that his trial counsel, Attorney Robert Laguna ("Attorney Laguna"), was ineffective. This PCRA petition was denied by the trial court, a decision that was upheld by the Superior Court of Pennsylvania. The instant habeas petition is based upon the same ineffective assistance of counsel claim. Ramos supports this claim with references to the evidence elicited at his trial and the testimony of Attorney Laguna at the PCRA hearing. We will now briefly recapitulate the salient aspects of these proceedings.

Ramos was on trial for an incident that occurred at the home of Angel Maldonado ("Maldonado") on April 13, 2002.[3] Ramos and a friend ("Diaz") went to Maldonado's home, Ramos knocked on the door, Maldonado answered, and a physical altercation ensued. Diaz entered the fray and struck Maldonado, who retreated to the kitchen. Ramos and Diaz pursued him and, when they caught him, continued to attack him. Ramos held Maldonado's neck, while Diaz struck Maldonado in the back with a knife.[4] Diaz pled guilty to conspiracy to commit murder, conspiracy to commit aggravated assault, and aggravated assault prior to Ramos' trial.

At Ramos' trial, Attorney Laguna believed it necessary to place into evidence the fact that someone other than Ramos had pled guilty to the stabbing. While questioning Maldonado, Attorney Laguna further believed that Maldonado was being vague when questioned about who stabbed him. Accordingly, Attorney Laguna proceeded to elicit testimony from Maldonado that he had witnessed Diaz plead guilty to "the charges" and to the stabbing.[5] Al-

---

**2.** The factual recitation contained herein is taken from the Magistrate Judge's apt summary contained in his R & R. With a mind toward brevity, and since the parties's objections to the R & R evince a thorough understanding of the facts, the instant factual recitation will synthesize the most salient points contained in the R & R into a cogent narrative. To ensure that the instant document is thorough and complete, we will incorporate by reference Sections III, IV, and V of the R & R, which we will attach to this Memorandum for ease of reference.

**3.** Prior to the incidents in question, Ramos and Maldonado were friends. At a time prior to the incident in question, both men dated women who were sisters. Ramos' relationship ultimately failed, but Maldonado's relationship was ongoing on the date in question. The sister Ramos had dated ultimately had three children with another man, Eric Fenetti ("Fenetti"). Some months prior to the incident, Ramos met Fenetti. On a later date, but before the date of the incident, Maldonado brought Fenetti to Ramos' place of work. Prior to April 13, 2009, Ramos informed others that he intended to "talk" to Maldonado.

**4.** There is no evidence that Ramos or Diaz arrived at Maldonado's residence armed. From this we can infer that the knife used to stab Maldonado was procured from Maldonado's kitchen. At trial, Ramos testified that he was unaware that Diaz was stabbing Maldonado.

**5.** Attorney Laguna entered upon this course of action prior to knowing that Diaz would invoke his Fifth Amendment right in order to avoid testifying at the Ramos' trial.

though Attorney Laguna never inquired as to the substance of the guilty plea, the prosecution took his line of questioning as opening the door to such matters.[6] Thereafter, the prosecutor elicited testimony that Diaz had pled guilty to conspiracy to commit murder. As a result, the trial judge twice instructed the jury that Diaz's guilt should in no way bear on their determination of Ramos' guilt.[7] The jury returned a guilty verdict with regard to the conspiracy to commit murder, conspiracy to commit aggravated assault, and assault charges.

After unsuccessfully filing a PCRA petition, Ramos filed the instant habeas petition, the merits of which were analyzed by the Magistrate Judge. After a review of the trial transcript, Magistrate Judge Smyser determined that Attorney Laguna's actions constituted ineffective assistance of counsel. In making this conclusion, Magistrate Judge Smyser noted that Attorney Laguna's perception that Maldonado was being vague in his trial testimony was not supported by the testimony itself, as Maldonado was "emphatically clear ... that Diaz stabbed him." (Rec. Doc. 24 p. 19 (citing Rec. Doc 14., Ex. A, p. 73)). Magistrate Judge Smyser noted that introducing evidence of Diaz's culpability for the stabbing in no way negated Ramos'

culpability with regard to the conspiracy charges, and, in fact, opened the door for the prosecution to elicit testimony that was directly inculpatory to Ramos in relation to those charges.[8] (Rec. Doc. 24 pp. 20–21). The Magistrate Judge noted that without introduction of Diaz's guilty plea, there was little evidence to support the theory that the Diaz and Ramos conspired to kill Maldonado; however, with such evidence in the record, in order to acquit Ramos of that conspiracy charge, the jury "would have had to reject the out-of-court co-conspirator's implicit assertion, under oath [and despite the adverse effect on his own interest], that he and Ramos had actually [jointly] planned to murder Maldonado." (*Id.* 20).

Further, Magistrate Judge Smyser noted that Attorney Laguna's closing argument he made no exculpatory use of Diaz's guilty plea as it related to the conspiracy charges, whereas the prosecutor relied extensively, almost exclusively, on the same during his closing argument. (*Id.* p. 24). Although the trial court instructed that the substance of the guilty plea could not be used as evidence of Ramos' guilt, Magistrate Judge Smyser asserted that there could be no way of knowing whether the substance of the guilty plea affected the jury's deliberations. (*See id.* pp. 24–25).

6. Without Attorney Laguna's inquiry as to the existence of the guilty plea, the charges to which Diaz pled guilty could not have been admitted into evidence by the prosecution. *See Bruton v. United States*, 391 U.S. 123, 125, 130, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Pointer v. State of Texas*, 380 U.S. 400, 405, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Commonwealth v. Maleno*, 267 Pa.Super. 560, 407 A.2d 51, 52 (1979).

7. In fact, in response to a question from Juror No. 12 regarding the effect Diaz's guilty plea had on Ramos' trial, the trial judge responded: "[Y]ou are to decide the case independently on the facts. I told you what he pled guilty to ... I mean that's a fact. You can't make that go away. Pretend you never heard

it. You heard it, but you are simply to decide in this particular case, forget about Mr. Diaz, did the Commonwealth prove this Defendant guilty beyond a reasonable doubt either as a conspirator or as an accomplice or both?" (Rec. Doc. 29–2, Ex. A at 198–99).

8. Magistrate Judge Smyser further asserted that it was unreasonable for Attorney Laguna to believe that the prosecutor would not take his line of questioning as opening the door to inquire as to the substance of Diaz's guilty plea. (*Id.* p. 18). In lieu of placing Diaz's guilty plea into evidence, the Magistrate Judge opined that Attorney Laguna could have achieved his objective by seeking a jury instruction reminding the jury not to speculate about the case(s) of co-conspirators.

This inference was counted against Attorney Laguna in the R & R.[9] In light of all of the foregoing, Magistrate Judge Smyser concluded that, while Attorney Laguna had acted strategically in a manner he calculated would serve Ramos' interests, the strategy was in fact unreasonable. However, the Magistrate Judge opined that Attorney Laguna was ineffective only in relation to the conspiracy to commit murder charge, as there was ample evidence of a conspiracy to assault Maldonado without Diaz's guilty plea, meaning that the admission of the guilty plea was not prejudicial in the latter regard. Accordingly, Magistrate Judge Smyser recommended that we grant the instant petition as it relates to the conspiracy to commit murder charge.

## III. DISCUSSION

Petitioner is proceeding under 28 U.S.C. § 2254. That statute states, in pertinent part, "An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-(I) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law." 28 U.S.C. § 2254(1) (1996). Here, the "clearly established Federal law" which undergirds Petitioner's habeas claim is the Sixth Amendment right to effective assistance of counsel. In articulating the standard of an ineffective assistance of counsel claim, the Supreme Court of the United States stated, "[A] defendant must show that counsel's performance was deficient, and that this prejudiced the defense." *Wiggins v. Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citing *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).[10] Having taken cognizance of this standard, and for the reasons chronicled above, Magistrate Judge Smyser concluded that Attorney Laguna was ineffective in his representation of Petitioner with regard to the conspiracy to commit murder charge, meaning that the instant petition should be granted to that extent and denied in all other respects.

9. The Magistrate Judge refers to the admission of the guilty plea as "apparently outcome determinative." (*Id.* p. 31).

10. "To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.' We have declined to articulate specific guidelines for appropriate attorney conduct and instead have emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Wiggins v. Smith,* 539 U.S. at 521, 123 S.Ct. ·2527 (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052). "A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the totality of the circumstances, the challenged action 'might be considered sound trial strategy.'"

*Utz v. Sobina,* 2006 WL 1455595 *7 (W.D.Pa. 2006) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). "The question is not whether the defense was free from errors of judgement, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place." *Utz,* *7 (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052).

"[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Wiggins,* 539 U.S. at 534, 123 S.Ct. 2527 (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). "In a case of 'grave doubt' about the harmlessness of the error, the writ should be issued." *Utz,* *8 (citing *O'Neal v. McAninch,* 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)).

Both the Petitioner and Respondents object to the R & R. The Petitioner claims that Attorney Laguna's conduct prejudiced him and was ineffective as to all charges, meaning that the instant petition should be granted in all respects. Conversely, the Respondent contends that Attorney Laguna did not provide ineffective assistance, meaning that the petition should be denied in all regards. We shall address these contentions and the merits thereof *seriatim*.

## A. Petitioner's Objections

In the first instance, Ramos contends that the instant petition should be granted because the introduction of Diaz's guilty plea constituted reversible error and therefore bespeaks Attorney Laguna's deficiency as trial counsel. Specifically, Ramos agrees with the R & R to the extent that it suggests that Attorney Laguna's actions rendered him ineffective with respect to the conspiracy to commit murder charge; however, Petitioner also claims that Attorney Laguna's actions rendered him ineffective with regard to the aggravated assault and conspiracy to commit aggravated assault charges. In support of this claim, he notes that the Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Supreme Court of the United States has held that it is a violation of the Confrontation Clause to admit into evidence inculpatory statements of a co-defendant when that co-defendant does not testify at trial. *Bruton v. United States*, 391 U.S. 123, 125, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In *Commonwealth v. Maleno*, 267 Pa.Super. 560, 407 A.2d 51 (1979), the Superior Court of Pennsylvania further stated that evidence of the mere fact of a co-defendant's guilty plea violated the Confrontation Clause. *See Maleno*, 407 A.2d at 52 (holding that admitting evidence of a guilty plea for purposes of establishing unavailability was indistinguishable, for the purposes of the Confrontation Clause, from admitting the substance of the guilty plea). Consequently, Petitioner asserts that he should be awarded a new trial because Attorney Laguna opened the door for the jury to hear evidence regarding Diaz's guilty plea without having the opportunity to cross-examine him, which allegedly evinces Attorney Laguna's deficiency as trial counsel.

■ While this argument is appealing on its face, further consideration of the applicable case law reveals that it is unavailing. As the Superior Court of Pennsylvania noted in its denial of Petitioner's PCRA petition, "absent a showing to the contrary, we presume that jurors follow the court's instructions." (Rec.Doc.29, Ex. P, pp. 6–9) (citing *Commonwealth v. Robinson*, 581 Pa. 154, 864 A.2d 460, 513 (2004)). In the matter *sub judice*, the trial judge instructed the jury that they should not consider Diaz's guilty plea as substantive evidence against Ramos.[11] There is no record evidence indicating that the jury improperly considered Diaz's guilty plea as substantive evidence of Ramos' guilt as to the assault charges.[12] Accordingly, there

---

**11.** To reiterate, the trial judge stated, "[Y]ou are to decide the case independently on the facts. I told you what [Diaz] pled guilty to ... I mean that's a fact. You can't make that go away. Pretend you never heard it. You heard it, but you are simply to decide in this particular case, forget about Mr. Diaz, did the Commonwealth prove this Defendant guilty beyond a reasonable doubt either as a con-

spirator or as an accomplice or both?" (Rec. Doc. 29–2, Ex. A at 198–99).

**12.** Petitioner maintains that the above referenced instruction was ambiguous and confused the jury, meaning that the presumption enunciated in *Robinson* has been rebutted. To be sure, the instruction is rather tortured. However, even assuming *arguendo* that it was

is no reason to believe that Ramos would have been acquitted on the assault charges if the references to Diaz's guilty plea, and the substance therein, were never made.[13] Consequently, since we can detect no appreciable prejudice to Ramos on the assault charges,[14] we will overrule Petitioner's objections insofar as his ineffective counsel argument is grounded in the Confrontation Clause.

 As an alternative argument for Attorney Laguna's ineffectiveness on the assault charges, Petitioner appeals to the elements of the substantive charges and the trial evidence adduced in relation thereto. In Pennsylvania, a person commits aggravated assault if he "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S. § 2702(a)(1). "Malice is a crucial element of aggravated assault, and is established when there is a 'wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty....'" *Commonwealth v. McClendon,*

874 A.2d 1223, 1229 (Pa.Super.2005) (internal citations omitted).[15]

 The record evidence at Ramos' trial indicated that on the night of the incident in question, Ramos and Diaz punched Maldonado in concert before Ramos restrained Maldonado while Diaz punched and stabbed him in the back. We believe that participating in the intentional beating and stabbing of a defenseless victim constitutes "extreme indifference to human life" and therefore qualifies as aggravated assault. Further, the R & R indicates Ramos himself testified that on the night of the beating he and Diaz resolved to "get" Maldonado and subsequently ventured to Maldonado's home. From this testimony and the acts that occurred upon Ramos' and Diaz's arrival at Maldonado's home, we believe a reasonable jury could conclude that Ramos and Diaz entered into an agreement to assault Maldonado, intended to do so, and carried through on this intent upon their arrival. Accordingly, based on above testimony alone, we believe that a reasonable jury could conclude that Ramos and Diaz were guilty of aggravated assault and conspiracy to commit aggravated assault. This conclusion is

---

ineffective, as will be noted there was ample evidence of Petitioner's guilt on the assault charges independent of the Diaz guilty plea.

**13.** As we will explain below, there was record evidence independent of Diaz's guilty plea that would have supported the assault convictions. Accordingly, the convictions on the assault charges are consistent with the jury obeying the jury instructions, and any antithetical conclusion cannot be logically drawn therefrom.

**14.** Having determined that there was no prejudice to the Petitioner, we need not analyze if Attorney Laguna's actions were reasonable under the circumstances in order to conclude that he provided effective assistance with regard to the assault claims. *See Strickland,* 466 U.S. at 697, 104 S.Ct. 2052 (stating, "[T]here is no reason for a court ... to approach the [components of the ineffective as-

sistance of counsel] inquiry in the same order or even address both components of the inquiry if the defendant makes an insufficient showing on one.").

**15.** To prove conspiracy, "the trier of fact must find that: (1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another ... to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime." *Commonwealth v. Murphy,* 577 Pa. 275, 844 A.2d 1228 (2004). Each member of a conspiracy is held liable for all acts committed by co-conspirators in furtherance of the conspiracy. *See e.g., Commonwealth v. Wayne,* 553 Pa. 614, 720 A.2d 456 (1998).

drawn from evidence independent of Diaz's guilty plea. Therefore, it is our determination that the entry of the reference to the guilty plea at Ramos' trial did not prejudice Ramos with regard to his conviction for aggravated assault and conspiracy to commit aggravated assault, as he most likely would have been convicted of those crimes even in the absence of the guilty plea's entry into evidence. Petitioner would have us find that the introduction of the guilty plea so poisoned the well that we must disregard the other, considerable evidence of his guilt on these charges. We decline to do so. It is our belief that Ramos suffered no actual prejudice relative to the assault charges as a result of the references to Diaz's guilty plea, and the substance contained therein. Therefore, we shall overrule Petitioner's objections in their entirety.

## B. Respondents' Objections

■ Respondents argue that Attorney Laguna's conduct did not rise to the level of ineffective assistance of counsel relative to the conspiracy to commit murder charge because his strategy in eliciting the testimony related to Diaz's guilty plea was reasonable, and since no prejudice inured from eliciting that testimony as there is no evidence that the jury disobeyed the jury instruction related to it.[16] We cannot agree.

As the Superior Court noted, and as asserted at the PCRA hearing, Attorney Laguna's conduct was premised on his beliefs that: (I) a conspiracy was evident from the trial testimony; (II) it was important for the jury to hear that another individual (Diaz) was responsible for the stabbing;[17] and (III) Maldonado was vague in responding to questions asking him to identify the individual that stabbed him.

As Magistrate Judge Smyser noted in his R & R, the evidence of conspiracy to murder, exclusive of Diaz's guilty plea, was dubious at best. (*See* Rec. Doc. 24 p. 29). There was no direct testimony that Ramos and Diaz had entered into a common plan or scheme to murder Maldonado.[18] There likewise was no circumstantial evidence from which a jury could reasonably infer that such a plan was consummated.[19] These conclusions are underscored by the

---

**16.** Respondents also note that in denying the Petitioner's PCRA petition, the Superior Court of Pennsylvania ruled on the issue of Attorney Laguna's ineffectiveness and determined that his actions were not unreasonable and therefore did not constitute ineffective assistance of counsel. Respondents now assert that, "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Accordingly, the Respondents argue, quite correctly, that the determinations of the Superior Court should be granted great deference. However, as we will explain, we believe that there is sufficient record evidence to overcome this presumption of correctness.

**17.** This was evidently aimed at gaining an acquittal on the attempted murder charge.

**18.** Diaz did not testify and, as Magistrate Judge Smyser noted, the following facts are the only facts Ramos admitted: (I) he had a disagreement with the victim, (II) he agreed with the codefendant to go to the victim's home on the night of the crime, (III) he knocked on the door, (IV) he punched the victim, (V) he continued to fight the victim, (VI) there was a knife involved in the fight, and (VII) his initial reaction was to lock himself in his room after he heard the ambulance. (*See* Rec. Doc. 14, Ex. M).

**19.** We previously determined that a jury could infer the existence of a conspiracy to commit *aggravated assault* from the following record facts: (I) on the night in question, Ramos and Diaz resolved to "get" Maldonado and subsequently ventured to Maldonado's home; (II) upon arriving at the victim's residence, Ramos and Diaz punched him in concert before Ramos retrained the him while

prosecution's closing argument, which relied heavily, if not exclusively, on Diaz's guilty plea to establish the common plan or scheme necessary to support a conspiracy charge.[20] Accordingly, we believe that Attorney Laguna's conclusion that the trial evidence clearly established a conspiracy was unreasonable as it related to the murder conspiracy.

Further, while it was reasonable to adduce evidence that attributed the stabbing to someone other than Ramos,[21] Attorney Laguna's decision to use the Diaz guilty plea as the conduit for such evidence was premised on the belief that Maldonado could not unambiguously and convincingly identify the individual who stabbed him. However, a review of the trial transcript, and in particular Attorney Laguna's cross-examination of Maldonado, belies this belief:

> Q [Laguna]: So that's what happened. So Charlie [Ramos] punches you. You guys were fighting. At some point he gets you down or he has you in some kind of headlock or he has you and it is at that point when you

feel this stuff on your back that according to you, Gabriel Rosa–Diaz stabbed you?

A [Maldonado]: Yes.

Q: Charlie never stabbed you?

A: No.

(Rec. Doc. 14 Ex. 4, p. 73). This excerpt establishes that Maldonado was not equivocal or vague in identifying the individual who stabbed him, meaning that eliciting information regarding Diaz's guilty plea to establish the same was unnecessary. However, the mere fact that eliciting the testimony was unnecessary does not, by itself, render Attorney Laguna's conduct ineffective. His actions rose to the level of ineffective assistance not because they were unnecessary in light of his objective to gain an acquittal on the attempted murder charge, but because they directly opened the door for the prosecution to elicit evidence that would have never been heard by the jury and that directly inculpated Ramos in a conspiracy to murder Maldonado, a crime for which, as noted, there was little additional evidence of guilt.[22]

Diaz punched and stabbed him in the back with one of Maldonado's kitchen knives. While a jury could reasonably infer from these facts an intent to inflict bodily harm upon Maldonado, we believe that inferring an intent to kill from these facts alone is a leap in logic that a reasonable jury would not make, especially considering that: (I) Ramos and Diaz went to Maldonado's home without a weapon; and (II) Ramos' claim that he was unaware that Diaz was stabbing Maldonado was uncontroverted by trial evidence.

**20.** We believe it logical that the prosecutor would have identified in his closing argument any and all incriminating evidence, aside from the Diaz plea, that established a conspiracy or from which an inference of conspiracy could be logically drawn. That the record reveals he did not cite to any substantial evidence other than the Diaz plea shows the magnitude of the problem caused by its admission.

**21.** Such evidence would support an acquittal and the attempted murder charge.

**22.** To articulate our position differently, Attorney Laguna's *objective* of gaining an acquittal on the attempted murder charge was not unreasonable. There were two ways to accomplish this objective: (I) using Maldonado's testimony; or (II) eliciting evidence regarding Diaz's guilty plea. Attorney Laguna chose the second route, which was unreasonable for the following reasons. Both avenues would have readily accomplished the objective of "putting the knife in someone else's hands." The first avenue had no potentially *detrimental consequences* associated with it. The second avenue, however, did have potentially detrimental consequences associated with it, namely that it could open the door for the prosecution to elicit evidence that the jury would not otherwise hear and that directly inculpated Attorney Laguna's client in a crime for which acquittal was a real possibility absent the evidence, but for which convic-

For the foregoing reasons, we believe that there are sufficient facts to rebut the presumption of correctness inuring to the Superior Court's determination that Attorney Laguna's conduct was not unreasonable. In fact, it is our opinion that Attorney Laguna's conduct was deficient and unreasonable because he failed to exercise the customary skill and knowledge of a competent defense attorney. However, this determination alone does not render Attorney Laguna's conduct ineffective. In order to arrive at that conclusion, we need to determine whether his unreasonable conduct prejudiced the Petitioner.

We again note that there is a presumption that a jury will obey a jury instruction. However, this is only a *presumption* and can be rebutted by record evidence and the circumstances of the case. As we have already noted, there was little or no evidence, absent Diaz's guilty plea, to establish the common plan or scheme necessary to sustain a conviction for conspiracy to commit murder. Accordingly, we have stated our opinion that a reasonable jury would not have inferred from this evidence alone the common plan or scheme necessary to convict Ramos of conspiracy to murder Maldonado. The fact that the jury returned a guilty verdict on the conspiracy to commit murder charge indicates that it necessarily and improperly considered Diaz's guilty plea as substantive evidence

against Ramos.[23] Our determination that an acquittal on this charge was likely in the absence of evidence related to Diaz's guilty plea renders Attorney Laguna's actions in introducing such evidence prejudicial to Ramos on the conspiracy to commit murder charge.

Since we have determined that Attorney Laguna's conduct was both unreasonable and prejudicial to Ramos with regard to the conspiracy to commit murder charge, we believe that Attorney Laguna provided ineffective assistance with regard to that charge.[24] We will therefore overrule Respondent's objections in their entirety and enter the following Order.

### REPORT AND RECOMMENDATION

J. ANDREW SMYSER, United States Magistrate Judge.

### I. INTRODUCTION

This is a 28 U.S.C. § 2254 habeas corpus petition. Charles Ramos is the petitioner. Ramos was convicted by a jury on February 13, 2003 in the Dauphin County Court of Common Pleas of criminal conspiracy to commit murder, criminal conspiracy to commit aggravated assault and aggravated assault. He was acquitted on a count of attempt to commit homicide. He was sentenced on March 28, 2003. His sentence was, upon the conviction for conspiracy to commit murder, a term of imprisonment of

---

tion was a real possibility in light of the evidence. Given these two choices, we believe that a reasonable, competent defense attorney under these circumstances would have chosen the first avenue in order to avoid jeopardizing a favorable verdict on any crime where acquittal was a possibility. Accordingly, we believe that Attorney Laguna's decision to walk down the second avenue was patently unreasonable, even though he accomplished his objective of gaining an acquittal on the attempted murder charge.

**23.** The Respondents argue the verdict is consistent with obeying the jury instruction pro-

scribing consideration of Diaz's guilty plea as substantive evidence against Ramos. However, their argument seems to conflate the conspiracy charge and the attempted murder charge, and in any event, we believe such an argument is specious for the reasons outlined above.

**24.** We are compelled to note that Attorney Laguna appears frequently before us and has at all times provided competent and zealous representation to his clients. However, even the most accomplished advocate is capable of choosing a strategy that goes awry and ends in disaster. Such was the case here.

90 months to 180 months; upon his conviction for aggravated assault, a term of imprisonment of 54 months to 120 months, concurrent; and, upon his conviction for conspiracy to commit aggravated assault, a term of imprisonment of 54 months to 120 months, concurrent. Fines and restitution were ordered.

The petitioner appealed, and his conviction was affirmed by the Pennsylvania Superior Court. The issues raised by the petitioner upon his direct appeal are not presented in this petition.

The petitioner filed a Pennsylvania Post Conviction Relief Act Petition, stating the claim that trial counsel had been ineffective in causing and allowing the jury to hear testimony from the assault victim that his co-defendant Gabriel Rosa–Diaz had pleaded guilty to conspiracy to commit murder and conspiracy to commit aggravated assault. (Doc. 14, Exhibit I). A hearing was held on that petition on October 25, 2005. The petition was denied by the trial court by Order of March 17, 2006 (Doc. 14, Exhibit M) as amended by Order of April 20, 2007. (Doc. 14, Exhibit N). The Superior Court affirmed by Memorandum Opinion of March 29, 2007. (Doc. 14, Exhibit P). The Pennsylvania Supreme Court did not allow an appeal by Order of July 24, 2007. (Doc. 14, Exhibit R).

The petition in this court was filed by the petitioner *pro se* (Doc. 1), and states the same ineffective assistance of counsel claim. It was filed on October 22, 2007. A response to the petition was filed (Doc. 11) on December 9, 2007. By Order of January 8, 2008, the Federal Public Defender was appointed to represent the petitioner. The petitioner filed a brief in support of the petition (Doc. 23) on April 3, 2008. A brief in opposition was not filed.

## II. APPLICABLE LAW

28 U.S.C. § 2254 provides in part as follows:

(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

\* \* \*

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

\* \* \*

The petitioner has exhausted state judicial remedies here as to his claim of counsel's failure to protect his Sixth Amendment rights by introducing the co-defendant's guilty plea.

A claim of ineffective assistance of counsel requires a two part analysis. First, the

petitioner must establish that counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). There is a strong presumption that counsel's conduct falls within the range of reasonable professional assistance. *Nix v. Whiteside,* 475 U.S. 157, 165, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). Counsel's performance should be viewed from counsel's perspective at the time without the distorting effects of hindsight. *Duncan v. Morton,* 256 F.3d 189, 200 (3d Cir.2001). Second, the petitioner must establish that counsel's deficient performance prejudiced the defense. *Strickland, supra,* 466 U.S. at 687, 104 S.Ct. 2052. To establish prejudice the petitioner must show that there is a reasonable probability that but for counsel's errors the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. 2052.

In applying Section 2254(d), the court is guided as follows:

> [A] state court's decision is an unreasonable application of clearly established law, under § 2254(d)(1) if the state court: (1) unreasonably applies the correct Supreme Court precedent to the facts of a case; or (2) unreasonably extends or refuses to extend that precedent to a new context where it should (or should not) apply.

*Shelton v. Carroll,* 464 F.3d 423 (3d Cir. 2006).

## III. TRIAL EVIDENCE

The following paragraphs summarize trial evidence material to this petition. The trial transcript is in the record, Doc. 14, Exh. A. At trial, Harrisburg Police Officer Gold testified that he was called to 1112A Cloverly Road at about midnight. Angel Maldonado had two stab wounds in the back. Harrisburg Police Officer Kimmick testified that in the kitchen, at the rear of Maldonado's residence, there was a broken drawer and a broken cabinet and there were items of silverware scattered about on the kitchen floor. There was blood on the kitchen floor. A steak knife had blood on it. A broken part of the blade of that knife was found.

Angel Maldonado testified that he knew Charles Ramos, the defendant, who had been his best friend for ten years. Maldonado's girlfriend is Jeanie Gonzales. Her sister is Nancy Gonzales. Nancy Gonzales did go out with Charles Ramos, in the past. Nancy Gonzales had three children with Eric Fenetti. Some months prior to the stabbing incident Ramos met Fenetti. Later, but before the stabbing incident, Maldonado went with Fenetti to a Harrisburg store, where Ramos happened to be. The three men went outside the store to a parking lot. Maldonado introduced Ramos to Fenetti. After that, Ramos came to Maldonado's apartment and asked Maldonado to come outside to play basketball. This was curious to Maldonado, because Ramos did not customarily play basketball. The two men had a conversation. Maldonado queried Ramos about whether Ramos had some grudge towards Maldonado involving Eric Fenetti and Ramos denied having a grudge.

Maldonado next saw Ramos on April 13, 2002, at about midnight. Maldonado was asleep, on his sofa, at his 1112A Cloverly Road apartment. Charles Ramos knocked, Maldonado opened the door, and the two began to have a conversation at the door. After Maldonado had declined Ramos' invitation to go out with Ramos, Maldonado saw a second man outside facing the street, "with a black hoody covering his face." Maldonado then knew something was going to happen, and then Ramos swung at Maldonado with a punch. Maldonado moved back. The two began fighting inside the doorway. The other man then struck Maldonado, who then re-

treated into his kitchen. He went to the cabinet, thinking to get something to scare the two men out of the apartment. He did not get a chance to pick something up. Both of the other men were hitting him; then, Ramos grabbed his neck and he fell to the floor. While Ramos held his neck, the other man hit him in the back. The other man then said to Ramos, "let's go, let's get out." The two ran, and Maldonado ran after them, not knowing he had been stabbed. When he discovered his injuries, he telephoned 911. He had suffered a punctured lung and a punctured intestine. Maldonado stated that Ramos did not stab him, and that the other man stabbed him while Ramos held him down. He identified the knives in the police photographs as knives that came from his kitchen drawer. He does not know of the two men bringing any weapon(s) with them.

Cross-examination questions from defense counsel were asked to elicit from Maldonado that he had been present in court earlier in the day when Ramos' codefendant Diaz had pleaded guilty and had admitted that he (Diaz) had stabbed Maldonado in the back.

Harrisburg Police Officer Lau testified that Ramos had provided a false alibi after the incident. He also confirmed that his investigation caused him to conclude that both knives photographed had come from Maldonado's kitchen.

Lau, too, was questioned about Diaz's guilty plea. He was questioned about it by the prosecutor, who asked whether Lau was present when Diaz plead guilty to the crime of conspiracy to commit murder and to the crime of conspiracy to commit aggravated assault. Defense counsel's objection was overruled, and Lau testified that he was present when Diaz entered these guilty pleas.

After the Commonwealth rested, defense counsel attempted to call Diaz as a witness. Diaz cited his Fifth Amendment right to remain silent. The court declared Diaz, who had pleaded guilty but had not been sentenced, to be unavailable. Defense counsel sought to introduce prior recorded statements given by Diaz, which was not permitted by the court.

The court then instructed the jury, at the outset of the defense phase of the trial, that the defense wanted to call Diaz and that Diaz was unavailable because he had invoked his Fifth Amendment right to remain silent.

The defendant, Charles Ramos, testified. He stated that he and Angel Maldonado had been best friends. The friendship had broken up. Ramos went to Maldonado's apartment because he wanted to talk to Maldonado about the incident where Maldonado brought Eric Fenetti, who had a relationship with Ramos' girlfriend, to Circuit City where Ramos was working. Ramos and Diaz, that evening, had been drinking. Diaz had proposed to Ramos that they "get" Maldonado. They drove to Maldonado's apartment. Ramos knocked. Maldonado answered the door with hostility. The two confronted each other with angry questions. Maldonado told Ramos that Fenetti had come with Maldonado to Circuit City to beat Ramos up. Ramos punched Maldonado. Maldonado ran to the kitchen. Ramos tripped. Maldonado obtained a knife from the kitchen. Ramos grabbed Maldonado in a bear hug, and tried to cause Maldonado to go to the floor and to drop the knife. Diaz was acting independently of Ramos. Ramos let Maldonado go, and turned around, and Diaz was out the door. Ramos then also ran out the door. Diaz was cut. He told Ramos that he had been cut when he tried to grab the knife from Maldonado that Maldonado was holding. Ramos agreed with Maldonado that Ramos had Maldonado in a headlock-like hold. Ramos did not

know that Maldonado had been stabbed until Diaz told him after they fled that he (Diaz) had stabbed Maldonado.

Ramos acknowledged that he provided a false statement to the detective. He testified that he did not have it in mind to murder someone or to stab someone. He had fought with Maldonado on prior occasions, not resulting in injuries.

On cross-examination, Ramos stated that he had told people before the April 13 incident that he was going to "speak with" Maldonado. He had had a lot to drink and had used cocaine before going to Maldonado's apartment. He spread the word that he was going to talk to Maldonado because he thought that Maldonado was going to do something to him. Diaz was considered by Ramos to simply be riding along to Maldonado's place.

Ramos acknowledged on cross-examination that he had not told Investigator Lau that he (Ramos) was worried about being stabbed by Maldonado.

In the closing argument for the defendant (Doc. 14, Exh. B), defense counsel argued that there was not a plan or agreement to kill, and cited the fact that no weapon was taken to Maldonado's apartment by Ramos or Diaz. Counsel argued that the plan to use deadly force was on the part of Diaz alone, and that Ramos was neither a co-conspirator nor an accomplice. Counsel asserted that the prosecution was seeking to punish two men for the crime(s) of one.

In the prosecutor's closing argument to the jury (Doc. 14, Exh. C), the prosecutor argued that "[y]our single best piece of evidence that a member of this criminal conspiracy had the intent to kill was the guilty plea of Gabriel Rosa–Diaz. He plead guilty right here yesterday. I had the intent to kill. When you consider that evidence, there is no reasonable doubt that the participants in this criminal conspiracy had the criminal intent to kill." *Id.* at p. 8.

## IV. PCRA HEARING

Roger Laguna, Esq., trial counsel, testified at the PCRA hearing (Doc. 14, Exhibit E) on October 5, 2005, stating that he had expected there to be a two defendant trial (Ramos and Diaz), that Diaz pleaded guilty "at the last minute," and that the trial strategy of defendant Ramos was to be acquitted of attempted murder because Ramos had not stabbed Maldonado. The defense objective was to show that Diaz did the stabbing. Laguna felt that the evidence that "a conspiracy had occurred" was clear. Laguna stated that he questioned Maldonado on cross-examination about who had stabbed Maldonado because Maldonado was "being vague." He did not ask Maldonado about Diaz's guilty plea(s), but the prosecution had taken Laguna's questions as an opening of the door to question Maldonado about such things. Laguna thought that prosecutor Consiglio's use of the guilty plea was unfair. Laguna intended to question Diaz at trial and to have Diaz state that he had done the stabbing. After learning that he could not call Diaz, Laguna still wanted to place the knife in Diaz's hand.

Laguna understood the conspiracy charge in this case to be that the petitioner was charged with going to Maldonado's home to hurt him. He did not articulate any strategy for a potential acquittal as to either conspiracy count, but emphasized that he felt it to be important for the jury to hear that another defendant had admitted to doing the stabbing because "somebody needed to be punished for that."

## V. STATE COURT DECISIONS

The trial (and PCRA) Court in deciding the PCRA petition decided that, although the petitioner's claim of ineffective assistance of counsel has arguable merit, counsel had a reasonable strategic basis for eliciting testimony from the stabbing vic-

tim that he had been present to hear the admission of the petitioner's co-defendant to stabbing the victim (testimony that led, over defense counsel's objection, to further testimony that the petitioner's co-defendant had pleaded guilty to conspiring with the petitioner to murder the victim). The PCRA court also decided that there is not a reasonable probability that, but for the errors and omissions of counsel, the outcome of the proceedings would have been different. (Doc. 14, Exh. M).

In its Memorandum Opinion of March 28, 2007 denying the appeal by the petitioner of the PCRA court's order denying the PCRA petition, the Superior Court concentrated upon the trial court's instructions to the jury; in particular, the trial court's statement to the jury that the co-defendant's guilty plea should not be considered as evidence. The Superior Court held that the petitioner's claim does not have even arguable merit. The Superior Court also held that counsel's strategy was not unreasonable. (Doc. 14, Exh. P). The Superior Court held that trial counsel's cross-examination of Maldonado did not result in the admission of Diaz's guilty plea as substantive evidence to establish Ramos' guilt, because the trial court had responded to Juror Number 12's question by instructing that evidence of Diaz's plea could not be considered for that purpose. The Superior Court summarized the case as follows:

> Ramos and Diaz appeared at Maldonado's house where Ramos began to quarrel with Maldonado at the front door and then attempted to punch him. During the ensuing scuffle Diaz joined the assault, prompting Maldonado to retreat to his kitchen to seek some implement for defense against his two attackers. Both attackers followed Maldonado into the house and, while Ramos held the victim in a headlock, Diaz stabbed him twice in the back with a kitchen knife. Both attackers then fled the house.

At trial, Ramos's counsel elicited testimony from the victim on cross examination that co-defendant Diaz had pled guilty to "the charges" and had admitted stabbing the victim in the back while the victim and Ramos fought. N.T., Jury Trial, 2/12/03–2/13/03, at 76. On re-direct, the Commonwealth questioned the victim in greater detail about the charges to which Diaz had pled, eliciting that two of the charges were for conspiracy, an offense that requires at least two participants. N.T., Jury Trial, 2/12/03–2/13/03, at 82. The Commonwealth then twice emphasized in its closing that Diaz's plea was in fact "your best single piece of evidence that a member of this criminal conspiracy had the intent to kill." N.T., Commonwealth's Closing Argument, 2/13/03, at 8. After the trial court instructed the jury on the law, juror number 12 questioned the court concerning the purpose for which the jury could consider Diaz's confession as follows: "I want to make sure I am clear on one thing. When your were talking about Mr. Diaz, were you referring that [sic] we were not allowed to take into consideration that he has already plead guilty to [sic]?" N.T., Jury Trial, 2/12/03–2/13/03, at 195. The court responded with the following clarification:

> No, ma'am. You are to decide the case independently on the facts. I told you what he pled guilty to and the attorneys. I mean that's a fact. You can't make that go away, pretend you never heard it. You heard it but you are simply to decide in this particular case, forget about Mr. Diaz, did the Commonwealth prove this defendant guilty beyond a reasonable doubt either as a conspirator or as an accomplice or both.

N.T., Jury Trial, 2/12/03–2/13/03, at 195–196. Following deliberation, the jury found Ramos guilty of the aggravated

assault conspiracy charges as well as conspiracy to commit homicide, but significantly, acquitted him of a more serious charge of Criminal Attempt Homicide.

(Doc. 14, Exh. P).

## VI. DISCUSSION

Upon a study of the trial transcript, including the closing arguments of counsel, the instructions of the trial court to the jury, the questions that were asked by the jury during its deliberations and the trial court's responses to them, the transcript of the PCRA hearing, and the decisions of the trial court and of the Superior Court addressing the PCRA petition, it is concluded that this is a 28 U.S.C. § 2254 habeas corpus petition in which the claim has been exhausted and that the factual basis for the claim has been developed in state court. For the reasons stated herein, we conclude that the state court adjudication has resulted in a decision involving an unreasonable application of clearly established federal law, the Sixth Amendment right to the effective assistance of counsel as that right has been defined and described in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The deficient performance by counsel was to have introduced evidence for the jury's consideration that would not have been admissible if the prosecution had sought to introduce it, evidence of the confession made in the form of a guilty plea of the petitioner's alleged co-conspirator to conspiring to the offense, and to have done so in a context where (as the prosecutor emphasized in closing to the jury) the coconspirator's confession was extremely inculpatory and not at all exculpatory as to the petitioner.

The *Strickland* standard for a determination of a Sixth Amendment issue involving the effectiveness of counsel is not materially different from the standard employed by the state court. Accordingly, the issue presented is whether the Superior Court has unreasonably applied the *Strickland* standard to the facts of this case.

The trial court and the Superior Court found that Ramos, the PCRA petitioner, had failed to show that trial counsel had no reasonable strategic basis for introducing Diaz's guilty plea to the charge of conspiracy to commit murder. The trial court and the Superior Court also found that Ramos had not proven that the outcome of the proceedings would have been different if this evidence had not been admitted. We conclude that the decision has applied the *Strickland* standard unreasonably. 28 U.S.C. § 2254(d). The reasons why the state court applied federal law unreasonably will be explained in the following pages.

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that the admission of statements from a non-testifying defendant that inculpated a co-defendant violated the latter's Confrontation Clause rights, despite a curative instruction.

In the petitioner's trial, his attorney elicited from the victim, Maldonado, testimony that Maldonado had witnessed the co-conspirator, Diaz, plead guilty to having stabbed Maldonado, a fact that the petitioner was under *Bruton* entitled not to have come to be known by the jury in his trial. Thereafter, as counsel should reasonably have foreseen, the prosecutor expanded Maldonado's statement into the statement that Diaz had in fact pleaded guilty to conspiring to commit murder.

The trial court stated, in declining to find as ineffective the approach taken by

Ramos' trial counsel, that "basically, trial counsel aimed to show that petitioner could not be guilty because somebody else already admitted to the guilt" and that this was a "reasonable strategic basis." (Doc. 8, Exhibit M). However, it was not a reasonable strategy.

The putatively reasonably strategic objective of defense counsel—to show the jury that someone is going to be held responsible for the stabbing—does not upon examination meet the reasonableness standard. First, as was developed during the PCRA hearing, counsel could not reasonably expect that the prosecution would not as it then did expand the depiction of Diaz's admission to having stabbed Maldonado to include Diaz's plea of guilty to conspiracy to commit murder. Once the conspiracy plea of Diaz was before the jury, the potential disadvantage of the Diaz plea, as illustrated by the prosecutor's logical closing argument that if Diaz was guilty in the conspiracy then Ramos surely was, outweighed any possible advantages and defeated and foreclosed the potential outcome that the jury could acquit Ramos of conspiracy to commit murder and of attempted murder if it believed him in his account of the episode, an account that was not glaringly inconsistent with the other evidence. Although it is to be recognized that the jury did acquit the defendant of attempted murder, and that defense counsel during the PCRA described that outcome as the object of his strategy, if the jury did find Ramos credible then, but for the conspiracy dilemma that the jury faced and presented to the court in its questions, it might reasonably have been expected to acquit also of conspiracy to commit murder.

Counsel stated in his PCRA testimony that it was a part of the reasoning underlying his strategy that attempted murder was the most serious charge that his client was facing. (Doc. 14, Exh. E, p. 6). However, attempted murder is not graded any more severely under Pennsylvania law than is conspiracy to commit murder. *See* 18 Pa.C.S.A. §§ 901, 903, 905(a). Since counsel's course of action did, upon close consideration of the trial record, cause it to become logically foreclosed for the jury to acquit as to the charge of conspiracy to commit murder, then, nothing was potentially to be gained and nothing was gained by the use of the admission of Diaz that he did the stabbing.

Counsel's determination that it would be useful to give up the defendant's right not to have the out-of-court confession of an alleged co-conspirator used as evidence in the defendant's trial was based upon the perception of counsel that the victim, Maldonado, was being vague in his trial testimony about who had stabbed him and that Ramos had not stabbed him. (Doc. 14, Exh. E, p. 8). This perception did not have a sound basis in the trial testimony, in that Maldonado was very emphatically clear and certain in his trial testimony that Diaz was the one who stabbed him. (Doc. 14, Exh. A, p. 73). Ramos had a better prospect for an acquittal as to the conspiracy charge if the fact of the alleged co-conspirator's guilty plea to conspiracy had not been placed into evidence than was the case with that fact in the evidence. Without it in the evidence, the jury might have found the use of deadly force not to have been planned. With it in the record, the jury in order to have acquitted Ramos would have had to reject the out-of-court co-conspirator's implicit assertion, under oath and despite his own interest not to be punished, that he and Ramos had actually planned together to murder Maldonado.

Defense counsel's core argument to the jury berating the prosecution for seeking to punish yet another defendant (in addition to Diaz) for the stabbing was a very unsubstantial argument in a case involving

a conspiracy charge and involving evidence clearly establishing a common plan and concerted action on the part of Ramos and Diaz. It was the issues of what exactly was planned and of who did exactly what that defendant Ramos had to address. An approach implying that Diaz's culpability somehow negated or reduced Ramos' culpability was not a reasonable approach.

Secondly, the strategy was based upon an assumption that the jury would not follow instructions and would not decide the case presented to it solely upon the evidence presented to it. Third, counsel could have sought an appropriate jury instruction specifically reminding the jury not to speculate about the case(s) of alleged co-conspirators. Such an instruction would have been of more utility to counsel than the admission of the Diaz plea.

The evidence plainly revealed that there was a simmering tension between Ramos and the victim, Maldonado. Accordingly it was Ramos, more so than Diaz, who could be seen to have been motivated to plan to harm Maldonado. When Ramos and Diaz went to Maldonado's apartment, the one with the motive to have a confrontation with Maldonado was Ramos, not Diaz. In this context, the fact of the plea of guilty by Diaz to the charge of a conspiracy with Ramos to commit homicide could not reasonably be seen by the fact finder to support any inference favorable to Ramos.

Counsel in choosing a strategy had to recognize and consider that the jury was going to receive from the trial court a full explanation of criminal conspiracy and in particular the elements of a common plan and of a meeting of the minds. Counsel could not reasonably expect, given that the evidence would show Ramos to have a motive to harm Maldonado, that Diaz's guilty plea to planning a murder with Ramos (whose motivation to confront Maldonado brought Diaz and Ramos to Maldonado's apartment that night) was going to somehow make it less likely that Ramos would be found guilty of planning that murder with Diaz than would have been the case in the absence of the disclosure to the jury of Diaz's guilty plea.

The trial Court in instructing the jury addressed the elements of criminal conspiracy thoroughly. (Doc. 14, Exh. A, pp. 188–191, 192–193, 202–208). After the prosecution had argued that the best evidence of Ramos' guilt of conspiracy was Diaz's guilty plea to conspiracy (Doc. 14, Exh. A, pp. 8–9), the Court in its main body of jury instructions referred to Diaz but did not instruct the jury as to the evidentiary treatment to be given to Diaz' guilty plea. But the jury asked for clarification, and the Court responded, on two occasions. The first instance was through the question asked by juror number 12:

**JUROR NO. 12:** I want to make sure I am clear on one thing. When you were talking about Mr. Diaz, were you referring that we were not allowed to take into consideration what he has already pled guilty to?

**THE COURT:** No, ma'am. You are to decide the case independently on the facts. I told you what he pled guilty to and the attorneys. I mean, that's a fact. You can't make that go away, pretend you never heard it. You heard it but you are simply to decide in this particular case, forget about Mr. Diaz, did the Commonwealth prove this defendant guilty beyond a reasonable doubt either as a conspirator or as an accomplice or both. What Mr. Diaz did or did not plead guilty to should not enter into your deliberations. Did they prove this defendant guilty on either of those theories, conspiracy or accomplice? Yes, they did. No, they didn't. You resolve that.

(Doc. 14, Ex. A, pgs. 198–199).

The second instance where the trial Court undertook to further address the

jury about the elements of conspiracy was in response to the jury's note to the Court asking the Court to "reclarify and define conspiracy and how accomplice fits into the law. We are all confused on conspiracy to commit homicide and how Charlie [Ramos] would be associated with it." (Doc. 14, Exh. A, pp. 201–202). The Court provided a comprehensive answer. *Id.* at pp. 202–208.

The closing arguments are a part of our 28 U.S.C. § 2254 habeas corpus record. (Doc. 14, Exhibits B & C). A review of defense counsel's closing argument indicates no affirmative or exculpatory use made by counsel in presenting the theory of Ramos' case to the jury of the fact of Diaz's guilty plea. Counsel asserted that Diaz had pleaded guilty to attempting to kill Maldonado, and asked the jury "[h]ow many guys can you convict on one crime?", and asserted, "the real killer stood up and plead guilty and they are trying to still keep this guy in it."

Defense counsel at trial had elicited from Maldonado, the victim, that Diaz had pleaded guilty to stabbing Maldonado. (Doc. 14, Exh. A, p. 76). The trial Court permitted the prosecutor through questioning the investigating detective to establish that Diaz had pleaded guilty to conspiracy to commit murder and to conspiracy to commit aggravated assault. *Id.* at p. 112. When counsel opened the door to the subject of Diaz's guilty plea in court, counsel could not expect to be able to limit the scope of that subject to the fact that Diaz admitted to doing the stabbing of Maldonado and could not prevent the inference to be drawn that Diaz had pleaded guilty to conspiring *with Ramos* to kill Maldonado.

The Superior Court determined that Diaz's guilty plea was not admitted as substantive evidence. It is unclear how the trial Court and counsel viewed the evidentiary status of the evidence of the references that had been made in the testimony to Diaz's plea. But, the prosecutor in closing argument unambiguously argued it as admitted probative evidence supporting an inference that Diaz had admitted to having planned with Ramos to kill Maldonado. It was the petitioner's attorney who had brought this information to the jury's attention and had irreversibly given rise to the jury's confrontation of the question how, if Diaz had admitted that he had conspired with Ramos to kill Maldonado, when the circumstances clearly placed Diaz and Ramos together at Maldonado's door with Ramos planning to confront Maldonado, Ramos could be found not guilty of that same conspiracy. The fact of Diaz's confession was placed in to the record by the petitioner's attorney, without objection. It was not stricken. And, although the trial Court may have instructed that it not be considered as evidence of guilt, the trial Court did not say how or for what alternative purpose it was to be considered and the prosecutor forcefully argued that it was evidence of guilt.

We do not disagree with the Pennsylvania Superior Court that "counsel acted strategically in a manner calculated to serve Ramos' interests," but we do not agree that the strategy was not unreasonable. It was unreasonable to bring in to Ramos' trial the fact of his co-defendant's guilty plea to having conspired with Ramos to commit murder, and subsequent trial events did so demonstrate. The prosecutor used the fact of the co-defendant's confession emphatically.

In the analysis of the reasonableness of the strategic choice to bring in Diaz's confession to having conspired with Ramos to murder Maldonado, it must be recognized that, since Ramos was in the role of principal protagonist and Diaz in the role of assistant, if Diaz who used deadly force says that it was a conspiracy to murder

Maldonado that could not help Ramos. If Diaz could be a witness, other inferences might have justified presenting him. Maybe he could have explained his plea in a way that would have preserved an argument that Ramos was not guilty of conspiracy to commit murder. But given Diaz's Fifth Amendment objection to being a witness, the only inference would be that he had said that he conspired with Ramos to murder Maldonado. That could not help Ramos.

■ An out-of-court inculpatory statement by a criminal defendant's co-participant in a course of conduct giving rise to criminal charges is not admissible to prove the guilt of the defendant. *Bruton, supra.* The out-of-court defendant's inculpatory statement is not subject to cross-examination and can have a strong probative force in the jury's consideration of the defendant's case. Effective criminal defense counsel would be reasonable to avoid the admission into evidence of an alleged co-conspirator's confession to the conspiracy unless there were not a realistic possibility that it would be inculpatory as to the defendant, and would seek to avoid its admission as a matter of course unless it would have an exculpatory effect as to the defendant.

It is recognized that it was before knowing that Diaz would not testify that defense counsel did delve into Diaz's guilty plea in cross-examining Maldonado. Counsel did ask whether Diaz had admitted to stabbing Maldonado, not whether Diaz had pleaded guilty to conspiring with Ramos to kill Maldonado. Defense counsel may have believed that the evidence as to Diaz's guilty plea would go no further than that Diaz had admitted to stabbing Maldonado. However, as already noted, Maldonado was not uncertain that it was Diaz who stabbed him, and trial counsel has not stated any basis for him to have anticipated any contrary evidence. It was

to show that another person would be punished for the stabbing that counsel wanted to admit the fact of Diaz's guilty plea.

Counsel's consideration of how his question to the victim, Maldonado, calling for the revelation of the Diaz guilty plea would play out was stated as follows:

> Everybody in the courtroom knew somebody needed to be punished for that [the stabbing of Maldonado]. I thought it was in [Ramos'] best interests to let the jury know that somebody was punished for it. Somebody pled guilty and said they did that and quite frankly, I think that's why he was acquitted of attempted murder because the jury heard that Mr. Diaz pled guilty to that and did it.

(Doc. 14, Exh. E, pp. 18–19).

The petitioner's trial attorney testified further that he believes that Ramos got exactly the benefit from the introduction of the Diaz guilty plea that was intended, the acquittal on Count I. *Id.* at p. 23. However, counsel does not state why an acquittal of attempted murder was a worthwhile trade-off for a conspiracy to commit murder conviction. Without the evidence of the co-conspirator's confession, a conviction of the murder conspiracy charge was not necessarily a likely outcome and could be avoided if the jury found Ramos to be credible.

The state courts' adjudication that counsel was not ineffective is an adjudication that involves an unreasonable application of clearly established law. Permitting a co-conspirator's inculpatory admission to come in to evidence without a reasonable prospect of an advantageous result is counsel conduct that falls below an objective zone of reasonableness. We will consider whether the petition was prejudiced.

A jury who has heard in evidence the fact that Diaz has pleaded guilty to having formed a plan with Ramos to kill Maldona-

do, where the quarrel that had led Ramos and Diaz to go together to Maldonado's apartment was a quarrel between Maldonado and Ramos not involving Diaz, could not reasonably acquit Ramos of having formed a plan with Diaz to murder Maldonado. A jury who had not heard that Diaz had pleaded guilty to having formed a plan with Ramos could reasonably have found that Ramos did not intend to kill Maldonado and did not intend for Diaz to use deadly force against Maldonado, and could reasonably have found that a conspiracy to kill Maldonado had not been proved beyond a reasonable doubt.

Ramos would quite likely not have been convicted of a conspiracy to murder if the guilty plea of Diaz to conspiring to commit murder had not been admitted and if Ramos were found to be credible. The evidence of a conspiracy to use deadly force was, apart from Diaz's guilty plea, very weak. How Diaz came to be holding and using a kitchen knife that had been removed from Maldonado's kitchen drawer was not established with clarity or lack of uncertainty at trial, and the jury could have found that the knife was removed from its drawer by Maldonado. The jury had no reason to find that the knife was brought there by Ramos or Diaz. In the absence of evidence that Diaz or Ramos had brought a deadly weapon to Maldonado's home, there was not substantial evidence of a conspiracy to kill.

The trial Court and the Superior Court determined that the evidence was sufficient to support the defendant's conviction and that the jury would have reached the same conclusion as it did even without the introduction of the fact of Diaz's guilty plea to conspiracy to commit murder.

The principal point that causes us to disagree with this analysis is that, despite what facts Ramos had admitted [1], he had not admitted to facts that reasonably support an inference of an agreement to use a deadly weapon against Maldonado. Defense counsel had no problem with establishing that Diaz was the one that had stabbed Maldonado, and could convincingly argue that the knife used was a knife that was taken from a drawer in Maldonado's kitchen either by Maldonado or by Diaz during the unfolding of the assault. There was evidence to support a conspiracy to assault Maldonado, and counsel could not do much to defeat that proof. To permit or to cause the record to come to include proof of the co-participant's confession to a common scheme to murder Maldonado, a development that but for the introduction of a reference to Diaz's guilty plea would have been avoided, was the choice of a path that was erroneous and that was also apparently outcome determinative as to the conspiracy to commit murder conviction.

In the absence of the introduction of Diaz's guilty plea to conspiracy with Ramos to murder Maldonado, the prospect for an acquittal of Ramos on the charge of conspiracy to commit murder was not insubstantial. This is illustrated *inter alia* by the prosecutor's heavy, almost singular, reliance in the closing argument upon the fact of Diaz's plea of guilty to the charge of conspiracy to commit murder to support an inference that Ramos had been a party to a plan to kill Maldonado. It is illustrated by the absence in the closing argument of a statement of any theory as to when under the evidence the conspiracy to kill Maldonado was formed. (If the theory

---

1. The trial Court emphasized that the petitioner had admitted: (1) he had a disagreement with the victim, 2) he agreed with the codefendant to go to the victim's home on the night of the crime, 3) he knocked on the door,

4) he punched the victim, 5) he continued to fight the victim, 6) there was a knife involved in the fight, and 7) his initial reaction was to lock himself in his room after he heard the ambulance. (Doc. 14, Exh. M).

368

were that it was formed prior to the arrival at Maldonado's door of Diaz and Ramos, the absence of a weapon would have given rise to considerable doubt. If the theory were that it was formed after Ramos had punched Maldonado, the manner in which Maldonado's kitchen knife came into the altercation, the cutting of Diaz's hand, Diaz's statement that Maldonado had initially held the knife, and Maldonado's unclear answers to questions about why he went into the kitchen, could create significant doubt about a plan to murder Maldonado). As to the convictions for aggravated assault and conspiracy to commit an aggravated assault, however, the strategic mistake of introducing Diaz's plea of guilty to conspiracy to commit murder and to having stabbed Maldonado does not appear to have been materially prejudicial, and accordingly relief as to those convictions is not warranted.

## VII. RECOMMENDATION

It is recommended that the petition for a writ of habeas corpus be granted as to the conviction for conspiracy to commit murder and that the court order the release of the petitioner from confinement as to that conviction for that count unless there is a retrial within ninety (90) days.

June 16, 2008.